# Richmond.

GENERAL RAILWAY SIGNAL COMPANY V. COMMONWEALTH.

January 13, 1916.

Absent, Cardwell, J.

1. CONFLICT OF LAWS—*Contracts—Place of Performance.*—A contract to furnish the necessary materials and labor and to erect a structure in this State, though signed in another State, is governed by the laws of this State.

2. FOREIGN CORPORATIONS—*Doing Business in State—What Constitutes—License—Interstate Commerce.*—The erection and installation within this State, by a foreign corporation, of a complete railway signal system, involving the employment of labor, skilled and unskilled, the stringing of wires, the construction of concrete foundations, and the erection and painting of signal mechanisms, all to be performed in this State, constitutes doing business in this State, and subjects such corporation to the license tax required of foreign corporations doing business in this State. Such a transaction is not a mere sale by the foreign corporation of its manufactured products, nor simply the completion of an interstate transaction. The materials necessary for such structures, though brought from another State, when delivered to the contractor in this State lost their interstate character and became a part of the property of the State, liable to be taxed here, and the charge of a license tax on the foreign corporation for business thus done in this State is no infringement of the Interstate Commerce act.

3. FOREIGN CORPORATIONS—*License—Measured by Capital.*—Where a foreign corporation carries on a purely local business separate from its interstate business, the State may impose an excise tax upon it for the privilege of carrying on such business and measure the same by the authorized capital of the corporation.

Appeal from the State Corporation Commission.

*Affirmed.*

The opinion states the case.

*McGuire & Wood, Hugh Satterlee* and *Joseph C. Taylor,* for the appellant.

*Jno. Garland Pollard, Attorney General* and *C. B. Garnett, Assistant Attorney-General,* for the Commonwealth.

Harrison, J., delivered the opinion of the court.

This is an appeal from a final order of the State Corporation Commission. In deciding the case the learned chairman of the Commission delivered the following opinion which fully and clearly states the facts of the case, and discusses the law applicable thereto:

"This is a proceeding instituted under section 1105 of the Code, charging the General Railway Signal Company with doing business within the State of Virginia without having complied with section 1104 of the Code, requiring every foreign corporation, before doing business in this State, to present to this Commission written powers of attorney, appointing some person residing in this State its agent upon whom process against the corporation may be served, two duly authorized copies of its charter and a certificate from the auditor of public accounts showing the payment of the fee required by law of such foreign corporation.

The defendant is a corporation of the State of New York, having an authorized capital of $5,000,000. Its principal office and factory is at Rochester, N. Y., where it owns and operates a large manufacturing plant devoted to the manufacture of materials chiefly used in the construction of railway signals which it sells and constructs all over the world. It has a branch factory at Montreal, Canada, and maintains branch offices in New York city, Chicago, and San Francisco.

By contract dated the fifth day of May, 1914, with the Southern Railway Company, the defendant agreed to furnish certain materials, supplies, machinery, devices and equipment,

as well as all necessary labor, and to install, erect, and put in place certain signals and apparatus shown on the plans and described in the specifications, from Amherst to Whittles, Virginia, fifty-eight miles, and to 'complete the entire system and turn same over to the railway company as a finished job, subject to inspection and acceptance, for $85,597. Similar contracts had been previously made and fully performed, one dated September 6, 1911, covering the lines of the Southern Railway in Virginia from Monroe to Montview, Virginia, thirteen miles, for $16,015, and one dated July 18, 1913, from Orange to Seminary, Virginia, seventy-six miles, for $112,428. The aggregate distance in this State covered by these contracts being 147 miles, and the total consideration being $214,040.

"The purpose of those signals is to promote safety of railway operation, and they operate automatically.

"In order to construct these signals as required by the contract it was necessary to employ in this State labor, skilled and unskilled, to dig ditches in which conduits for the wires are placed, to construct concrete foundations, and to paint the completed structures. The completed structures are along the side of the railway track, about two miles apart, and are twenty-two or twenty-three feet high. In the language of the witness, Moffett: 'It is necessary to erect the signal mechanism, the masts supporting the mechanism, the houses for protecting the relays, reactors, reactants and other similar electrical devices protected from the weather, then the transformers, high tension line arrestors and low tension line arrestors.' The completed structures are permanently attached to the freehold upon concrete bases.

"While counsel for the defendant insists that the main object of the transaction was to sell the materials which it manufactures in the State of New York, the contract and the letters leading up to the contract plainly show (unless the less includes the greater) that the main purpose expressed was to

erect, install and complete the signal system in Virginia, and that the furnishing of the material was the necessary and preliminary incident of the contract.

"The fact that the contract with the railway company was signed outside of Virginia and also that certain signalmen and skilled employees were brought from New York to do a part of the work, is urged as an incidental reason for the defendant's contention. This proposition, however, cannot be maintained, because not only the contract with the railway company but the incidental contracts made with the skilled employees were to be performed in Virginia, and, therefore, the contracts are governed by the laws of Virginia.

"*London Assurance* v. *Companhia de Moagens Do Barreiro,* 167 U. S. 160, 17 Sup. Ct. 785, 42 L. Ed. 120; *Andrews* v. *Pond,* 38 U. S. (13 Pet.) 65, 10 L. Ed. 61; *Bell* v. *Bruen,* 42 U. S. 169, 11 L. Ed. 89; *Bank of United States* v. *Daniel,* 37 U. S. (12 Pet.) 12, 9 L. Ed. 989; *Scudder* v. *Union National Bank,* 91 U. S. 406, 23 L. Ed. 245; *Graves* v. *Johnson,* 155 Mass. 211, 30 N. E. 818, 15 L. R. A. 834, 32 Am. St. Rep. 446.

"It is claimed for the defendant that the main purpose of the transaction on the part of the defendant company was the sale of its manufactured products, and the transaction is alleged to be similar to the ordinary sale of goods by a dealer in one State to a purchaser in another State, and the transportation of the goods so sold in interstate commerce to the purchaser. The case of *Robbins* v. *Shelby County Taxing District,* 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694, and similar cases, are relied upon to sustain that claim.

"Of course, we have no intention of questioning the authority of that case or of the cases following it, of which it is the prototype. The case at bar, however, cannot be brought within the rule there established. The facts of this case show that the object of the Southern Railway Company, the purchaser, was to secure the erection of permanent structures upon its

right of way, and not the purchase of goods to be transported in interstate commerce. In this transaction the interstate commerce ended when the materials shipped from the factory in New York were delivered, not to the Southern Railway, but to the defendant in Virginia. They then became a part of the property located in Virginia still owned by the defendant, liable to State taxation and no longer protected by the commerce clause of the Constitution.

"It is well established that if such materials had been brought into this State for the purpose of storage that they would be liable to State taxes, and surely it follows that if after the transportation was ended, its owner changed their form from personal property into real estate by building them into permanent structures, such a disposition of its property in this State is not interstate commerce. Coal sent by the owners in Pennsylvania to their agents in New Orleans, to be there sold for their account upon its arrival becomes part of the general mass of property in Louisiana, and is subject to taxation in common with all other property, and in precisely the same manner. *Brown* v. *Houston,* 114 U. S. 622, 5 Sup. Ct. 1091, 29 L. Ed. 257. A license tax imposed upon meat packing houses for selling meat brought into the State in interstate commerce is not a burden upon interstate commerce. *Armour Packing Co.* v. *Lacy, Treasurer,* 200 U. S. 226, 26 Sup. Ct. 232, 50 L. Ed. 451. The same principle is announced in *Kehrer* v. *Stewart,* 197 U. S. 60, 25 Sup. Ct. 403, 49 L. Ed. 666.

*The American Steel & Wire Co.* v. *Speed,* 192 U. S. 500, 24 Sup. Ct. 365, 48 L. Ed. 538, is most instructive. The American Steel and Wire Company selected the city of Memphis as a distributing point for its products, securing a local transfer company to take charge of its products when shipped to that point, assort them, store them in the transfer company's warehouses, and to make delivery therefrom in the original packages to its customers, ninety *per cent.* thereof outside of Tennessee,

either as expressly directed by it, or under general directions in favor of its recognized and approved customers, whose names were furnished to the transfer company. It was there held that when the goods reached the warehouses they had reached their destination and were liable to local taxation.

"In this case the warehouses were rented by the transfer company, and the goods were delivered in the original packages; ninety *per cent.* of them ultimately went to jobbers who resided beyond the limits of the State of Tennessee, and the remaining ten *per cent.* were delivered to Memphis jobbers, all however in fulfilment of contracts previously made at Chicago. As we understand the principle definitely fixed by this case, the goods having come into the State of Tennessee as the property of the foreign merchant and at rest there and the interstate journey having terminated, the goods became liable to taxation in that State, and the delivery of the goods after they thus reached their destination constituted doing business in the State in which such deliveries were made.

"In this case the court notes the distinction between imports in the legal sense, that is, goods brought into the State from abroad, which may be there freely sold in original packages, and goods transported from one State to another in interstate commerce.

"The defendant here relies also upon the case of *Pedersen v. Delaware, L. & W. Railroad Co.,* 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914c, 153. This case arose under the employer's liability act of April 22, 1908, giving the right of recovery against an interstate railway carrier for the death or injury of an employee while engaged in interstate commerce which may result from the negligence of any of the employees of such company. The court decided that an employee of an interstate railway carrier killed while carrying a sack of bolts or rivets to be used in repairing a bridge which was regularly used in both interstate and intrastate commerce, was employed in interstate commerce within

the meaning of the act referred to, giving a right of recovery against the carrier for the death of an employee while so employed. The issue there did not involve even remotely the question we are here considering. In that case, however, the court notes a distinction which has a very important bearing upon the question here involved. Mr. Justice Van Deventer in the opinion makes this reservation: 'Of course, we are not here concerned with the construction of track, bridges, engines or cars which have not become instrumentalities of such commerce, but only with the work of maintaining them in proper condition after they have become such instrumentalities and during their use as such.' This reservation has a very special application to this case, for here the signal towers were not being repaired and had not yet become the instrumentalities of interstate commerce.

"If the erection of such structures is construed to be engaging in interstate commerce and not doing business within the State in which they are erected, then it follows that none of the great railway supply companies, nor those persons and corporations engaged in the construction of locomotives, engines, cars, the cutting of ties, the building of station houses, the construction of office buildings, and producing many other things ultimately intended to be instrumentalities of commerce, are doing business within the States in which such occupations are carried on. If such a doctrine be established, then the defendant company is not doing intrastate business in the State of New York because it is engaged in the construction of instrumentalities intended to be used in interstate commerce. We believe the true doctrine to be that those engaged in manufacturing or producing instrumentalities of commerce are engaged in intrastate business in the State in which the work is done and subject to all the laws of the State governing local business transactions. After such instrumentalities have become instrumentalities of interstate commerce then different questions, not pertinent here, may arise.

"There are other cases relied upon by the defendant's counsel in which there was only a single transaction where it was held, and it is established, that the foreign corporation may follow its goods into the other States to which they have been transported in interstate commerce, and may there do incidental acts of installation so that the goods may be used for their designed purpose. No case, we think, however, can be found which will justify numerous or repeated transactions of this character, or even a single transaction which necessitates construction work of the character here involved. For instance, the construction of portions of a building in Dallas by a St. Louis construction company, is doing business in Texas. *St. Louis Metal Co.* v. *Beihlarz* (Tex. Civ. App.), 88 S. W. 512.

"One of the cases relied upon by the defendant is *Leschen Rope Company* v. *Moser* (Tex. Civ. App.), 159 S. W. 1018. This was a contract under which the foreign corporation sold the material for the construction of an aerial tramway to be erected across the Rio Grande river at a point about ninety miles from Marathon, Texas, to be used for carrying zinc ores from the mine in Mexico to a point in Texas. The provision of the contract, which is pertinent, reads thus: 'To facilitate the erection and make proper adjustment of the machinery we can furnish you with a thoroughly competent superintendent for eight dollars per day and hotel and traveling expenses, payable in United States currency, time and expense to be charged from the time of leaving St. Louis and until his return to St. Louis; such charges and expenses to be paid us at the end of each week.' The court says, in construing this provision: 'No obligation rested upon Moser to accept or retain the services of this man, but it appears that he did accept such services, and even delegated to him the power to hire and discharge those who erected the tramway for Moser and were paid by Moser for their work. The contract did not provide for the sale and delivery of a tramway after its completion, nor did it call for the sale of a tramway

delivered with an agreement to install the same, but it was merely proposed to furnish a competent superintendent in order to facilitate the erection of the machinery by Moser and make proper adjustment thereof. We do not think this incidental agreement can be given the effect of making the transaction one not involving interstate commerce. To so hold would mean that a corporation in another State would have to forego sales in such State of machinery to be erected in this State if the purchaser refused to buy, unless the corporation furnished a capable man to supervise the erection and adjustment of the machinery, or else it would have to secure a permit to do business in this State.'

"It will be noted that in the case at bar the General Railway Signal Company did provide for the construction of the signal towers, and made repeated agreements to install the same, whereas in the Moser case the agreement was to furnish a superintendent to facilitate the erection of the machinery by the purchaser. This superintendent was to be paid by the purchaser, all installation was done by Moser, the purchaser, and all the expenses thereof paid by him, whereas here the installation was done by the General Railway Signal Company, the foreign corporation, and all the expenses were borne by it, and the contract called (to use its own language) 'for the completion of the entire system and the turning over of the same to the railway company as a finished job.'

"It would seem that the mere statement of these facts is conclusive of the proposition that the defendant company, during the many months it has taken to construct these signals, has been doing business in this State, and is, therefore, liable to the fine imposed for the violation of the statute referred to. If, however, any doubt may remain from the consideration of the facts and the cases referred to, it seems that the case of *Browning* v. *Waycross*, 233 U. S. 16, 34 Sup. Ct. 578, 58 L. Ed. 828, decided April 6, 1914, removes that doubt conclusively. The facts of that case are that a St. Louis corporation

through its agents in Georgia, solicited orders and made sales of lightning rods, the price paid for the rods to the St. Louis corporation, including the duty to erect them without further charge. The agent of the St. Louis corporation was fined for violating an ordinance of the city of Waycross imposing an occupation tax of $25.00 upon lightning-rod agents or dealers engaged in putting up or erecting lightning rods within the corporate limits of the city of Waycross. It was claimed that the erection of the lightning rods was a mere incident of the sale, and constituted the carrying on of interstate commerce, which could not be taxed without violating the commerce clause of the Constitution. We cannot do better, we think, than to quote the language of Chief Justice White in affirming the judgment of the lower court imposing the fine: 'We are of opinion that the court below was right in holding that the business of erecting lightning rods under the circumstances disclosed was within the regulating power of the State, and not the subject of interstate commerce, for the following reasons: (a) Because the affixing of lightning rods to houses was the carrying on of a business of a strictly local character, peculiarly within the exclusive control of State authority; (b) Because, besides, such business was wholly separate from interstate commerce, involving no question of the delivery of property shipped in intrastate commerce, or of the right to complete an interstate commerce transaction, but concerned merely the doing of a local act after interstate commerce had completely terminated. It is true that it was shown that the contract under which the rods were shipped bound the seller, at his own expense, to attach the rods to the houses of the persons who ordered rods, but it was not within the power of the parties by the form of their contract to convert what was exclusively a local business, subject to State control, into an interstate commerce business, protected by the commerce clause. It is manifest that if the right here asserted were recognized, or the power to accomplish by contract what is here claimed

were to be upheld, all lines of demarcation between national and State authority would become obliterated, since it would necessarily follow that every kind or form of material shipped from one State to the other, and intended to be used after delivery in the construction of buildings or in the making of improvements in any form, would or could be made interstate commerce.'

"The Chief Justice in this case adds: 'Of course we are not called upon here to consider how far interstate commerce might be held to continue to apply to an article shipped from one State to another, after delivery and up to and including the time when the article was put together or made operative in the place of destination in a case where, because of some intrinsic and peculiar quality or inherent complexity of the article, the making of such agreement was essential to the accomplishment of the interstate transaction. In saying this we are not unmindful of the fact that some suggestion is here made that the putting up of the lightning rods after delivery by the agent of the seller was so vital and so essential as to render it impossible 'to contract without an agreement to that effect—a suggestion, however, which we deem it unnecessary to do more than mention in order to refute it.'

"And this principle is invoked by the defendant in this case to sustain the position that the erection of these railway signals simply constituted the completion of an interstate transaction. We believe, however, that this is to misunderstand and misconstrue the qualification referred to. In the first place, in the case at bar the defendant company was not selling an article of personal property to the railway company. It made a contract to construct the signals in Virginia, and much of the work done in Virginia was in no degree complex, such as concrete work, digging ditches, connecting wires, the employment of unskilled labor and painting, such as an ordinary painter could do; and it is admitted that they can and do sell the signals to certain railway companies which do all the construction work

for themselves, apparently finding no difficulty in securing competent electricians for the purpose, so there can be no inherent complexity about the construction of railway signals which cannot be overcome by those who desire to engage in such a business.

"Upon the whole case we have no doubt whatever that the defendant has violated the Virginia statute referred to, and persists in such violation. Therefore, we shall impose upon the company a fine of one thousand dollars, which is the amount of the fee which would have been required had the statute been obeyed."

This opinion, which we adopt as the opinion of this court, fully and satisfactorily expresses our views of the case considered by the Commission.

The last contention of the appellant, which does not appear to have been made before the Corporation Commission, is that the imposition of a tax upon the defendant's entire capital stock as a condition of its doing an intrastate business is a burden upon the interstate commerce done by said corporation, and, therefore, invalid under the Federal Constitution. In support of this contention, which we think is without merit, the appellant relies upon cases involving the right of the State to impose a license tax upon public service corporations engaged in both interstate and intrastate commerce within the State, which announce the well-settled doctrine that a State cannot lay a tax upon interstate commerce in any form.

These cases have no application to the present case. Here the defendant is a commercial corporation carrying on a purely local and domestic business quite separate from their interstate commerce transactions. Under such circumstances the State has the right to prescribe the conditions upon which such a corporation may do its intrastate business provided it lays no burden upon its interstate business. This question is disposed of by the case of *Baltic Mining Co.* v. *Massachusetts*, 231 U. S. 68, 34 Sup. Ct. 15, 58 L. Ed. 127, which holds that "where a

foreign corporation carries on a purely local business separate from its interstate business, the State may impose an excise tax upon it for the privilege of carrying on such business and measure the same by the authorized capital of the corporation."

There is no error in the order appealed from, and it is affirmed.

*Affirmed.*