## NATIONAL REFRIGERATOR COMPANY, Appellant, v. SOUTHWEST MISSOURI LIGHT COMPANY.

**Division One, June 6, 1921.**

1. **ABSTRACT: Commingling Matters of Record and Exception: Waiver.** An objection that the record proper fails to show that the motion for a new trial or the bill of exceptions was ever filed, and that such showing is made to appear only from the bill of exceptions itself, is, in view of the amendment to Rule 13, waived, unless the respondent serves his motion raising such objection within fifteen days after the service of the abstract.

2. ————: ————: **Meaning of Rule 13.** The amendment to Rule 13 adopted December 31, 1920, means (1) that the objection that record matter is by the abstract made to appear only as exceptions, or exceptions only as record matter, must be made in writing or print; and (2) the objections may be set forth in the printed brief or in a separate motion.

Natl. Refrigerator Co. v. Southwest Mo. Light Co.

3. **INTERSTATE COMMERCE QUESTION**: Determined by Federal Courts. The ultimate and final determination of all questions regarding interstate commerce, including the question whether the transaction carried on in this State by a foreign corporation was interstate commerce, rests upon the Federal courts.

4. **INTERSTATE COMMERCE**: Foreign Corporation: Doing Business in This State: No License. A foreign corporation, for a stated sum, made and performed a contract to furnish and erect, in complete running order, an ice-making plant of twenty-five tons daily capacity, in this State. The refrigerating machinery and all its parts were shipped to its order in this State and installed under its supervision; but for the purposes of installation, the company put in a cement foundation for the machines, which necessitated the hiring of carpenters, mixers, and masons, from four to fifteen men per day for several months, and the purchase of local material, consisting of lumber, hardware, pipe fittings, and a considerable amount of cement, such local "erection expenses" being contemplated by the contract. *Held*, that the entire transaction was not interstate commerce, but "doing business" locally was involved, separate and distinct from interstate commerce: and said foreign corporation having neither received nor applied for a license to do business within this State, cannot, in view of the statutes (Secs. 3027 to 3040, R. S. 1909), maintain a suit in the courts of this State for the balance due under the contract.

Appeal from Jasper Circuit Court.—*Hon. Grant Emerson*, Judge.

AFFIRMED.

*E. K. Robinett* and *Dewey & Foulke* for appellant.

(1) The court erred in finding the issues for the defendant, and that the contract sued upon, together with the performance of same, was within the purview of Secs. 3027-3040, R. S. 1909, relating to the licensing of foreign corporations in this State, because the contract and the evidence adduced regarding the performance of same shows that the whole transaction was interstate commerce and comprised within the meaning of the words "commerce among the several states" as used in the Federal Constitution, Article 1, Section 8, and that the said trans-

292    SUPREME COURT OF MISSOURI,

Natl. Refrigerator Co. v. Southwest Mo. Light Co.

action was not subject to state regulation and was not within the purview of the statutes of Missouri pertaining to foreign corporations. International Text Book Co. v. Gillispie, 229 Mo. 397; Jewel Tea Co. v. Carthage, 257 Mo. 383; Hess Warming Co. v. Grain Elevator Co., 217 S. W. 493; York Mfg. Co. v. Colley, 247 U. S. 21; Cooper Mfg. Co. v. Ferguson, 113 U. S. 736; Rearick v. Penna, 203 U. S. 512; Dozier v. Alabama, 218 U. S. 127. (2) A contract or negotiation which contemplates and results in the importation or introduction of merchandise into one state from another is interstate commerce, the test being the importation. Robins v. Taxing District, 120 U. S. 489; Crutcher v. Kentucky, 141 U. S. 47; Crenshaw v. Arkansas, 227 U. S. 389; Caldwell v. North Carolina, 187 U. S. 622; Kansas City v. McDonald, 175 S. W. 919; Dozier v. Alabama, 218 U. S. 124. (3) It is immaterial whether the contract is made in the state of the purchaser or of the buyer as affecting its interstate character. And it is also immaterial in whose name the goods are shipped. (4) Caldwell v. Carolina, 187 U. S. 622; Jewel Tea Co. v. Carthage, 257 Mo. 383; Cooper v. Mfg. Co., 113 U. S. 727; Dozier v. Alabama, 218 U. S. 124. (5) The character of the transaction in its interstate aspect is not affected even though the consummation of the contract may necessitate the performance of certain services inherently relating to and connected with the subject matter of the sale, that is services relevant and appropriate to the agreement made and inseparable therefrom. York Mfg. Co. v. Colley, 247 U. S. 21; Hess Warming & Ventilating Co. v. Grain Elevator Co., 217 S. W. 493; Jewel Tea Co. v. Carthage, 257 Mo. 383; Dozier v. Alabama, 218 U. S. 127; Engine & Mfg. Co. v. Vrooman Apartments Co., 154 Mo. App. 139. (6) The performance of individual contracts by a corporation in another state is not "a doing of business in the State" in the purview of the statute. Paint Co. v. Bredel Co., 193 Fed. 897; Cooper Mfg. Co. v. Ferguson, 113 U. S. 727; Caesar v. Capell, 83 Fed. 403.

(7)   Under comity of the States a foreign corporation has a right to use our courts, either as plaintiff or defendant. Reeder v. Robertson, 202 Mo. 522; Text Book Co. v. Gillispie, 229 Mo. 397.

*C. C. Spencer* and *A. E. Spencer* for respondent.

(1)   Appellant's brief fails to comply with Rule 15 of this court, in that it does not allege, distinctly or otherwise, the errors committed by the trial court. Rule 15 provides that "the brief for appellant shall distinctly allege the errors committed by the trial court." Vahldick v. Vahldick, 264 Mo. 529; Squaw Creek Drain. Dist. v. Hayes, 217 S. W. 20; Ross v. Bewley, 178 S. W. 495. (2)   The record filed by appellant does not show (1) that appellant filed any motion for a new trial, or (2) that any bill of exceptions was ever filed in the cause. Hence there is nothing before the court but the pleadings, stipulations of parties, and the judgment. Cunningham v. Consolidated School Dist., 215 S. W. 249; Wallace v. Libby, 231 Mo. 341; Langstaff v. Webster Groves, 246 Mo. 223. (3)   The evidence fully sustains the finding, on the theory that appellant, in attempting to perform the contract, was doing business in Missouri, within the meaning of the statutes relating to foreign corporations. It was admitted that it was a foreign corporation and had not complied with such statutes. Therefore the contract was void, and appellant would not maintain any suit in action, either legal or equitable, in the courts of this state, upon its demand. R. S. 1909, secs. 3037, 3039 and 3040. (a)   The plaintiff in carrying out the contract sued on was transacting business in the State of Missouri. Ntl. B. & L. Assn. v. Denson, 189 U. S. 408, 47 L. Ed. 870; United Lead Co. v. Elevator & Mfg. Co., 222 Ill. 199; John Deere Plow Co. v. Wyland, 69 Kan. 255, 76 Pac. 863; Tomson v. Iowa State Assn., 88 Neb. 399, 129 N. W. 529; Pennsylvania Co. v. Meyer, 197 U. S. 407, 49 L. Ed. 810; Williams v. Scullin, 59 Mo. App. 30; Chicago Mill

294        SUPREME COURT OF MISSOURI,

Natl. Refrigerator Co. v. Southwest Mo. Light Co.

& Lumber Co. v. Sims, 197 Mo. 507; Hogan v. City of St. Louis, 176 Mo. 157. (b) And it is equally certain that the transaction of business in this State by a non-complying foreign corporation makes all its contracts void, except in the case of transactions entirely within interstate commerce. Parke, Davis & Co. v. Mullett, 245 Mo. 168; Broom Co. v. Mo. F. & C. Co., 195 Mo. App. 305; Tri-State Amusement Co. v. Forest Park Co., 192 Mo. 404; Mill & Lumber Co. v. Sims, 197 Mo. 507; United Shoe Mfg. Co. v. Ramlose, 210 Mo. 631; Amalgamated Z. & L. Co. v. Mining Co., 221 Mo. 7; State ex rel. v. Robertson, 271 Mo. 475; Osborne & Co. v. Shilling, 74 Kan. 675. (c) The transaction here was not one of interstate commerce, but the things done by plaintiff amounted to doing business in Missouri within the meaning of the statutes relating to foreign corporations. General Ry. Signal Co. v. Virginia, 246 U. S. 500; Browning v. Waycross, 233 U. S. 16; State ex rel. v. Arthur Greenfield Co., 205 S. W. 619; City of St. Louis v. Parker-Washington Co., 271 Mo. 242; Wichita F. & S. Co. v. Yale, 194 Mo. App. 60; Refrigerating Machine Co. v. Penn. H. & P. Co., 178 Fed. 696; St. Louis Fireproofing Co. v. Beilharz, 88 S. W. 512; Smythe Co. v. Ft. Worth G. & S. Co., 105 Texas, 8, 142 S. W. 1157, 128 S. W. 1136; Buhler v. Burrowes Co., 171 S. W. 791; General Ry. Signal Co. v. Commonwealth, 118 Va. 301; Hastings Indus. Co. v. Moran, 143 Mich. 679; Curtain Co. v. Jacobs, 163 Mich. 72; Amusement Co. v. E. Lake Chutes Co., 174 Ala. 526; Mfg. Co. v. Dothan Bank, 176 Ala. 229; Nickerson v. Tank Co., 223 Fed. 843.

WOODSON, P. J.—This case was brought by the plaintiff, in the Circuit Court of Jasper County, against the defendant, to recover the sum of $12,890.41, balance alleged to be due it under a written contract to furnish the material and install at Joplin, Missouri, a certain ice plant described in the petition. Judgment was for the defendant and plaintiff appealed the cause to this court.

The contract (omitting formal parts) is as follows:

"We propose to furnish and erect at Joplin, Missouri, in complete running order and condition, and of the best material and workmanship, one ice-making plant of 25 tons capacity daily, as per specifications to be submitted, for the sum of twenty-two thousand, four hundred and thirty-six dollars, payments to be made as follows:

"Six thousand dollars on arrival of machines in Joplin, Missouri.

"Six thousand, four hundred and thirty-six dollars when machines are installed and ready to start, less freight charges and erecting expenses advanced by you.

"Ten thousand dollars or balance in two notes of $5,000 each payable in one and two years with interest at the rate of six per cent per annum. These notes to be executed by the purchasers or their succesors, or both, and in the event of the organization of a stock or incorporated company for the purpose of acquiring ownership in the said machines and apparatus, then the notes to be executed by the company, and secured by the entire issue of its capital stock."

The notes mentioned in the contract were never executed, hence the suit was for the balance due under the contract.

The suffciency of the pleadings are not questioned, so we will put them aside, except to say that the answer, among other things, charges that the plaintiff was a foreign corporation organized and doing business under the laws of Colorado and had never taken out a license to do business in this State as required by the statutes hereof. The reply among other things stated that the contract matter involved interstate commerce, and was therefore not governed by the laws of this State.

When the cause was called for trial the following stipulation was entered in by and between counsel for the respective parties (formal parts omitted):

"Whereas, there are several issues involved in the trial of this cause, some of which will require the exami-

nation and determination of long and complicated accounts and transactions; and,

"Whereas, one of the issues is presented by the second count of the last amended answer of the defendant and the denial thereof contained in the plaintiff's reply thereto, said issue being in substance the right of the plaintiff to have and maintain the suit and recover because of the alleged fact that it was and is a corporation under the laws of Colorado and had failed to comply with the laws of Missouri; said second count of the last amended answer and that portion of the reply referring thereto are hereby referred to and made a part hereof for a more definite statement of such issue; and,

"Whereas, the determination of such issue may or may not make unnecessary the trial of the further issues in the case, it is, therefore, agreed and stipulated that there shall first be tried to the court (a jury being waived thereon) the issue aforesaid, presented by the second count of defendant's last amended answer and that portion of reply relating thereto, that the parties shall from time to time during the present term of court submit their evidence on such issue unto the end that all the evidence must be submitted during said term of court and the matter finally submitted to the court for determination. That upon hearing and considering the matter aforesaid, the court shall determine and announce his finding on such issue. If such finding be for the defendant, thereupon final judgment shall be rendered in this cause in favor of the defendant and against the plaintiff, from which plaintiff may appeal. If such finding be for the plaintiff, the defendant shall thereupon file its counterclaim in the cause and the remaining issues, other than that above stipulated, shall remain for trial and be heard and determined by the court, no judgment to be rendered until determination of all the issues by the court, whereupon the defendant may appeal."

Vol. 288]          APRIL TERM, 1921.          297

Natl. Refrigerator Co. v. Southwest Mo. Light Co.

The following admission was also made at the trial in open court:

"Mr. Spencer: It is admitted that on the date of the making of the contract sued on, to-wit, January 7, 1902, the plaintiff was and has ever since been a corporation organized for business purposes under the laws of the State of Colorado, and that said plaintiff has never complied with the laws of this State, Missouri, and obtained a license authorizing it to transact business within this State, and that it never had or maintained a public office or place in this State for the transaction of business where legal service might be obtained upon it and where the books were kept required by the Missouri statute, and that the plaintiff never took any steps to procure a license or authority to transact business in this State.

"Mr. Dewey: This further thought: Whether this business as a whole is a transaction which would be made void by the statutes of Missouri or whether it would come under the exceptions which are allowed by Interstate Commerce. In other words the point we are working on today is whether this was a transaction or contract of interstate commerce."

In order to maintain the issues on its part plaintiff introduced the following evidence:

E. J. Ulrich, sworn as a witness on behalf of plaintiff, testified substantially as follows:

He first received a letter from the manager of the defendant by Mr. Geo. Myers, of Joplin, Missouri, at Colorado Springs, in September, 1901, regarding the installation of an ice plant. The letter was as follows (formal parts omitted):

"Mr. E. T. Skinkle, of Chicago, advises that you are going to be in Chicago some time next week. If it is possible for you to do so, please come *via* Kansas City, as I am very anxious to talk with you in regard to installation of one or two ice plants. In fact, I want to arrange my affairs so I can visit the ice plants which you now have in operation at an early date.

"Please advise me by early mail, if possible, when you will reach Kansas City, so I will be sure to be at home."

Later I met the gentleman in Chicago and entered into a contract to install an *ice plant* at their works near Joplin. This was in January, 1902. In pursuance of that contract we drew the plans, installed foundations for the machinery, and ordered the machinery and equipment for the plant. We put it in a building furnished us by the defendant which was already built and on the ground at Grand Falls, near Joplin, Missouri. We bought a large part of the machinery from the York Mfg. Company, some from a Chicago firm, some from the Liner Company, of Denver, and some we manufactured. We were interested in a factory in Chicago which made smaller plants, but this was too large for them to handle entirely, hence the purchases made from other sources. The machinery and parts were all shipped to our order at Grand Falls in Newton County, Missouri, and installed under our supervision. We paid the freight on it all and the defendant later refunded it to us. The business of the plaintiff is building ice and cold storage plants and installing refrigerating machinery. What we mean by installation is this: We put in cement foundations for the machines which necessitated the hiring of carpenters, mixers, masons, the purchase of some rough lumber to make the forms, a certain amount of cement and other matter used in such construction. Into these foundations the templates were set with the proper bolts for attaching the machinery and making it solid. The machinery was then taken from the car, placed on the foundations previously prepared, put onto bolts in same and made fast. These were the compressors. Then the tanks which came in sheets of steel were riveted together in one, two or four battery arrangement, as the case might be. Then the freezing coils and other coils are anchored, and lastly the cans were put in place. These cans, by the way,

were bought by the York people from a can manufacturing company in the East. People specialize. Some make cans, some ammonia compressors, etc. We purchased, in making up the parts of this plant, where we could get the best material. All of that material is assembled and put into working condition, and connection is made with the power. In this case we had to connect up to the main line of shafting of the Southwest Missouri Light Company, which had already been installed by them in this power plant. We bought very little stuff locally, as we had brought practically everything with us that would be necessary, except perhaps a bolt or nut or such, which we happened to be short of. In doing all this you can see we would need some pipe fitters, some pipe men, trench diggers, a few machinists and a carpenter here and there, all working under our skilled erecting engineers. There were some changes in plans and suggestions which took additional time in the installation and, moreover, the installation of an additional part of this plant by the Southwest Light Company, for which we, at their request, furnished the plans and advice—all gratuitously, however. We bought very little pipe for our installation work, though there was a good deal used by the Southwest Company, in the installation of the storage house just. mentioned. It took very little cement for the foundations, as there were but two machines and of a size not to require much. Our relations with the York People have always been very close. They have a western manager in Chicago, with whom I had a conference as soon as I had made the contract with the Southwest Company. We, the western manager and I, got on the train about the 9th or 10th of January, 1902, and went to York, Pennsylvania, and there drew the plans for the installation of the plant. It was at that time that we entered into an agreement to furnish and install for us a part of the machinery. This to be done under our supervision.

The foregoing was all the testimony introduced by the plaintiff. In order to maintain the issues on its part, the defendant introduced the following evidence:

Mr. George Myers testified for the defendant that he was an official of the defendant company at the time of the installation of the ice plant by the plaintiff; being a director and general manager; that he signed the contract for the purchase of the ice plant covered by the issues in this suit; that he thought the same was signed in Kansas City, Missouri; that the plaintiff after signing the contract did install the ice-making machines in connection with all the piping needed; also installed all of the cans and other apparatus that was intended to be furnished up to a certain stage, for the purpose of carrying out the contract, which work was done at Grand Falls near Joplin, after the stuff reached the land; that they were there several months doing the work and the force of men varied; that they were men employed by and working for and paid by the plaintiff; that after the plant was installed they had trouble in making *merchantable ice,* and representatives of the plaintiff stayed there working over the plant some months. That the experimental period came after six or eight months. That Mr. Weare Parsons was the superintendent who had the work in charge. He further testified that "Exhibit A" offered in evidence by plaintiff was the one signed by him. That when they found they could not make merchantable ice plaintiff "packed up their truck and got out."

Mr. Weare Parsons testified for defendant substantially as follows:

That at the time of the installation of the ice plant he was working for the defendant; that he was the superintendent of defendant's interests during the time; that plaintiff purchased a lot of material locally, such as was used in the installation of the work; the material being lumber, hardware, pipe fittings and incidental ma-

terial which was necessary for the work; that they shipped in the ammonia compressor with the condenser and air compressor, together with the general line of material required; that after its arrival the plaintiff employed all the common labor necessary and purchased quite a large amount of material locally to use in the erection and installation of the equipment; that the time consumed in the installation lasted from the first of June till the first of November; that they had a force of workmen of from four to fifteen as the work from time to time required; that these men performed their duties under the supervision of the National Refrigerator Company; that the character of the material purchased locally was such as would be required to install their work under like conditions; "in other words, such as was necessary to comply with their contract." That the York Mfg. Company had a contract with the National to install and did install the ammonia compressor and condenser for them, and that the rest of the installation was by the plaintiff under the supervision of a Mr. Fox. That certain laterals were in wrong and had to be rearranged, a filter installed and a· tweedale system of purification put in that took time and did not work well; that the changing of the laterals and air lines took about two weeks; that the first turnover was made about the first of. July, and the changes and readjustment and water troubles ran through the rest of the period named.

And this substantially was all the evidence, introduced by defendant bearing on the point at issue.

As before stated the findings of the court and the judgment thereof were for the defendant, and the plaintiff duly appealed the cause to this court.

I.   There are some preliminary questions to be disposed of before we approach the case upon its merits. First: It is insisted by counsel for respondent that there is nothing but the record proper before the court for

**Abstract.** consideration, for the reasons that the record proper, as shown by the abstract of the record, fails to show that the motion for a new trial and the bill of exceptions were ever filed.

Upon an inspection of the abstract we find that this insistence is true, but we are of the opinion that said omissions are cured by virture of the amendment of Rule No. 13 of this court, adopted December 31, 1920, which amendment reads as follows:

"If in any case any matter which should properly be set forth in the abstract as a part of the record proper, shall appear in the abstract as a part of the bill of exceptions, or *vice-versa,* such matter shall be considered and treated as if set forth in its proper place, and all objections on account thereof shall be deemed waived, unless the other party shall, within fifteen days after the service of such abstract upon him, specify such objection and the reasons therefor in writing and serve the same upon the opposing party or his counsel; and in the event such objection be so made, the other party may within ten days, from the service of such written objection, upon him or his counsel, correct his abstract so as to obviate such objection, if under the facts as shown by the record proper or the bill of exceptions in the trial court, such correction can truthfully be made."

While this amendment is not quite as clear in meaning as it might have been drawn, yet the spirit and meaning can scarcely be misunderstood, when its purpose is considered. It provides that "if in any case any matter which should properly be set forth in the abstract as a part of the record proper, shall appear in the abstract as a part of the bill of exceptions, or *vice-versa,* such matter shall be considered and treated as if set forth in its proper place, and all objections on account thereof shall be deemed waived, unless the other party shall, within fifteen days after the service of such abstract upon him, specify such objection and the reasons therefor in writing and serve the same upon the opposing party or his counsel," etc.

In reading this rule some three matters are left in doubt: (1) Whether or not the motion mentioned may be made in print as well as in writing. We think the clear meaning of the rule is, that the objections to the abstract cannot be made orally, but must be made in writing or its equivalent in purpose, in print. (2) Whether or not the objection mentioned in the rule must be contained in a separate motion from the opposite party's brief. From a casual reading of the rule one might be impressed with the idea that the objections should be contained in a separate motion from the brief, but when we come to consider the purpose of the motion that purpose will be served just as well if contained in the brief as if in a separate motion. (3) The most serious objection to the rule is that it does not clearly specify what matters can and cannot be cured by the rule. Of course the law must be followed regardless of the rule; in other words, the rule cannot repeal the provisions of the statute regarding any matter. For instance, the statutes specify what matters shall be preserved by the record proper, and what matters must be preserved by bill of exceptions, which statutes must be complied with regardless of the rule. If a matter required by the statute to be preserved in the record proper should, as a matter of fact, be preserved in the bill of exceptions only, or *vice-versa,* that error would not be cured by the rule, and the opposite party could by his motion call the attention of the court to the fact, that the matter was not in fact properly preserved in the proper legal container. The purpose of the rule is to correct errors of counsel in the preparation of their abstracts of record, where, by inadvertence or oversight, they abstract a matter which was properly preserved in the proper place, but the abstract erroneously shows that it was not preserved in the proper place, but in an improper place.

With these preliminary observations regarding the meaning of the rule, we are of the opinion counsel for respondent are not in a position to take advantage of

the rule, though their objections seem to be well grounded, for the reason that they failed to serve their motion containing their objections to the sufficiency of the abstract upon the appellant within fifteen days after the appellant had served the abstract upon them, as required by said rule. The files of this court show that respondent was served with a copy of the abstract on December 10, 1920, and that respondent's motion was served upon the counsel for appellant on January 5, 1921, twenty-five days after the service was had upon counsel for respondent, ten days too late according to said rule, to be available.

We therefore hold that counsel for the respondent waived the objections mentioned to the sufficiency of the abstract, and we must disregard the errors suggested in respondent's motion.

II. While counsel for appellant discuss numerous legal propositions in their brief, the ruling of the court upon but one of them is assigned as error, and under the rules of this court we will ignore all the others. The error assigned is stated by counsel in the following language:

*Interstate Commerce.*

"The court erred in finding the issues for the defendant Southwest Missouri Light Company, and that the contract sued upon, together with the performance of same, was within the purview of Sections 3027-3040 of the Revised Statutes of Missouri relating to the licensing of foreign corporations in said State, because the contract and the evidence adduced regarding the performance of same shows that the whole transaction was interstate commerce and comprised within the meaning of the words 'commerce among the several states' as used in the Federal Constitution, Article 1, Section 8, and that the said transaction was not subject to State regulation, and was not within the purview of the statutes of the State of Missouri pertaining to foreign corporations."

Before taking up the discussion of the error assigned, it may be well to notice certain rules at law in-

Vol. 288]          APRIL TERM, 1921.          305

Natl. Refrigerator Co. v. Southwest Mo. Light Co.

volved in this case that have been so firmly established by the State and Federal decisions that they may be considered as elementary.

(1) Under the Interstate Commerce clause of the Constitution of the United States, no State can interfere with, lay burdens upon or prohibit the transportation of interstate commerce into this State.

(2) . It is wholly immaterial where the contract is made effecting interstate commerce, and it will be enforced if otherwise valid.

(3) And the ultimate or final disposition of all questions regarding interstate commerce rests with the Federal courts.

In support of the assignment of error made by counsel for appellant we are cited to numerous cases, and especially the case of York Manufacturing Co. v. Colley, 247 U. S. 21. The facts of that case are thus stated by the court:

"The York Manufacturing Company, a Pennsylvania corporation, sued for the amount due upon a contract for the purchase of ice manufacturing machinery and to foreclose a lien upon the same. By answer the defendants alleged that the plaintiff was a foreign corporation, that it maintained an office and transacted business in Texas without having obtained a permit therefor, and was hence under Texas statutes not authorized to prosecute the suit in the courts of the State, and a dismissal was prayed. In reply the plaintiff averred that the contract sued on was interstate commerce, and that the State statute, if held to apply, was repugnant to the commerce clause of the Constitution of the United States. At the trial it was shown without dispute that the contract covered an ice plant guaranteed to produce three tons of ice a day, consisting of gas compression pumps, a compressor, ammonia condensers, freezing tank and cans, evaporating coils, a brine agitator and other machinery and accessories including apparatus for utilizing exhaust steam for making distilled water for filling the ice cans. These

288 Mo.—20

parts of machinery, it was provided, were to be shipped from Pennsylvania to the point of delivery in Texas and were there to be erected and connected. This work, it was stipulated, was to be done under the supervision of an engineer to be sent by the York Manufacturing Company, for whose services a fixed *per diem* charge of six dollars was to be paid by the purchasers and who should have the assistance of mechanics furnished by the purchasers, the supervision to include not only the erection but the submitting of the machinery to a practical test in operation before the obligation to finally receive it would arise. It was, moreover, undisputed that these provisions were carried out, that about three weeks were consumed in erecting the machinery and about a week in practically testing it, when after a demonstration of its successful operation it was accepted by the purchasers.

"The trial court, not doubting that the contract of sale was interstate commerce, nevertheless concluding that the stipulation as to supervision by an engineer to be sent by the seller was intrastate commerce and wholly separable from the interstate transaction, held that the seller by carrying out that provision had engaged in local business in the State and as the permit required by the State statutes had not been secured, gave effect to the statutes and dismissed the suit. The case is here to review the action of the court below sustaining such conclusion, its judgment being that of the court of last resort of the State, in consequence of the refusal of the Supreme Court of the State to allow a writ of error."

In disposing of that case the court held that the provision of the contract as to the services of the expert was germane to the transaction as an interstate contract and did not involve the doing of local business subjecting the appellant to regulations of the statute of Texas concerning foreign corporations. In the discussion of the case the court, at page 25, used this language:

"The only possible question open therefore is, was the particular provision of the contract for the service of an engineer to assemble and erect the machinery in question at the point of destination and to practically test its efficiency before complete delivery relevant and appropriate to the interstate sale of the machinery? When the controversy is thus brought in last analysis to this issue there would seem to be no room for any but an affirmative answer. Generically this must be unless it can be said that an agreement to direct the assembling and supervision of machinery whose intrinsic value largely depends upon its being united and made operative as a whole is not appropriate to its sale. The consequence of such a ruling if made in this case would be particularly emphasized by a consideration of the functions of the machinery composing the plant which was sold, of its complexity, of the necessity of its aggregation and unison with mechanical skill and precision in order that the result of the contract of sale—the ice plant purchased —might come into existence. In its essential principle therefore the case is governed by Caldwell v. North Carolina, 187 U. S. 622; Rearick v. Pennsylvania, 203 U. S. 507 and Dozier v. Alabama, 218 U. S. 124. In fact those cases were relied upon in the Waycross Case as supporting the contention that a mere agreement for the erection of lightning rods in a contract, made concerning the shipment of such rods in interstate commerce, caused the act of erection to be itself interstate commerce. But the basis upon which the cases were held to be not apposite, that is the local characteristic of the work of putting up lightning rods, not only demonstrates beyond doubt the mistake concerning the ruling as to the Waycross Case which was below committed, but serves unerringly to establish the soundness of the distinction by which the particular question before us is brought within the reach of interstate commerce.

"Of course we are concerned only with the case before us, that is, with a contract inherently relating to and intrinsically dealing with the thing sold, the machin-

ery and all its parts constituting the ice plant. This view must be borne in mind in order to make it clear that what is here said does not concern the subject passed on in General Railway Signal Co. v. Virginia, 246 U. S. 500, since in that case the work required to be done by the contract over and above its inherent and intrinsic relation to the subject-matter of the interstate commerce contract involved the performance of duties over which the State had a right to exercise control, because of their inherent intrastate character.''

There is no use of considering any more of the cases cited by counsel for appellant, for the reason that if the facts of the case at bar are substantially the same as they were in the York Case, supra, then this judgment must be reversed and the cause remanded for a new trial for the reason the York Case is the latest and controlling case upon that question. But in our opinion the facts in the case at bar are so materially different from those in the York Case, it is not controlling here; and we will now try to point out the differentiations between the two cases.

By referring to the contract sued on in this case, it will be seen that there is no provision that the appellant bound itself to furnish an expert to assemble and construct the ice plant at Joplin, Missouri, as was the fact in the York Case; moreover, in the case at bar the uncontradicted evidence shows that in constructing the plant appellant purchased a lot of material locally, such as was used in the installation of the work, the material consisting of lumber, hardware, pipe fittings and incidental materials which were necessary for the work; that appellant employed all the common labor necessary, consisting of a force of men numbering from four to fifteen, for a period of several months; plaintiff also purchased locally considerable quantities of cement with which to build the foundations upon which the ice plant was to rest. And it would seem that it was the intention of the parties that the labor and material above mentioned was to be em-

ployed and purchased locally, for the next to the last clause of the contract sued on provides that "six thousand, four hundred and thirty-six dollars [shall be paid] when machines are installed and ready to start, less freight charges and erection expenses advanced by you," meaning the respondent.

In our opinion the facts just mentioned clearly distinguish this case from the York Case supra, and bring it squarely within the ruling of the Supreme Court of the United States in the case of General Railway Signal Co. v. Virginia, 246 U. S. 500. The facts of that case are thus stated by the court:

"Just what did the defendant do in Virginia? It employed there about 20 men—11 signal engineers and experienced men and 9 laborers—for possibly four or five months altogether. They erected iron signal masts about two miles apart and fitted on them alternating current induction motors, signal arms, gears, relays and housing, transformers, line arresters, etc. To reach the rails they dug short, shallow trenches, to an aggregate amount of not over 1,600 feet in a hundred miles. The Southern Railway Company furnished and put up the necessary wooden poles and wires. The defendant's men applied the last coat of paint to the signal apparatus, the first coats having been applied at the factory.

"The defendant did these things in Virginia only because it could not do them in New York, and it had no desire or intention to establish its business in Virginia. Because of the nature of the defendant's products it was a complicated, tedious job to install them ready for use, but the defendant was in Virginia for that purpose and no other. It was merely completing a sale to the Southern Railway Company, and it did no business and had no relations with the citizens of Virginia except for hiring a few laborers.

"In short, the defendant was doing in the State isolated acts incidental to its manufacturing and selling

business conducted in New York. These acts completed, it might or might not ever again have so much as one employee in the State. To force such a casual, occasional entrant to secure a license to do business, continuously to maintain an office, to pay a license tax of $1,000 and an annual registration tax, would be, we respectfully submit, the height of injustice. The very language of the statutes regulating foreign corporations doing business in the State is manifestly ill chosen to achieve such a result.

"This court early decided that single transactions in a State by a foreign corporation, even in the conduct of its ordinary business, did not constitute 'doing business.' [Cooper Mfg. Co. v. Ferguson, 113 U. S. 727.]

"Of course, the whole subject of 'doing business' is interwoven with the effect of the commerce clause of the Constitution and many decisions assign one ground or the other apparently without much discrimination. More accurately speaking, however, if a foreign corporation is not doing business, there is no need to discuss the commerce clause, while if it is doing business, it may still be relieved from compliance with State statutes if its business be interstate."

The holding of the court in that case is well stated in the syllabus of the case:

"A foreign corporation, for lump sums, made and performed contracts to furnish completed automatic railway signal systems in Virginia, in the performance of which the materials, supplies, machinery, devices and equipment were brought from without, but their installation, as structures permanently attached to the soil, required employment of local labor, digging of ditches, construction of concrete foundations, and painting. *Held*, that local business was involved, separate and distinct from interstate commerce, and subject to the licensing power of the State. [Browning v. Waycross, 233 U. S. 16.]

"The Virginia law imposing a fee for the privilege of doing local business of $1,000 on foreign corporations with capital over $1,000,000 and not exceeding $10,000,-000 (Acts of 1910, c. 53, par. 38a), upheld, as not arbitrary or unreasonable under all the circumstances, though the case is on the border line."

Another case very similar to this one is that of Browning v. Waycross, 233 U. S. 16. The facts of that case as stated by the court are as follows:

"The plaintiff in error was charged in a municipal court with violating an ordinance which imposed an annual occupation tax of $25 upon 'lightning rod agents or dealers engaged in putting up or erecting lightning rods within the corporate limits' of the city of Waycross. Although admitting that he had carried on the business he pleaded not guilty and defended upon the ground that he had done so as the agent of a St. Louis corporation on whose behalf he had solicited orders for the sale of lightning rods; had received the rods when shipped on such orders from St. Louis and had erected them for the corporation, the price paid for the rods to the corporation including the duty to erect them without further charge. This it was asserted constituted the carrying on of interstate commerce which the city could not tax without violating the Constitution of the United States. Although the facts alleged were established without dispute, there was a conviction and sentence and the same result followed from a trial *de novo* in the Superior Court of Ware County, where the case was carried by *certiorari*. On error to the Court of Appeals that judgment was affirmed, the court stating its reasons for doing so in a careful and discriminating opinion reviewing and adversely passing upon the defense under the Constitution of the United States (11 Ga. App. 46). From that judgment this writ of error is prosecuted, because of the constitutional question and because under the law of Georgia the Court of Appeals had final authority to conclude the issue."

In affirming the decision of the state court the Supreme Court of the United States, at page 22, said:

"We are of the opinion that the court below was right in holding that the business of erecting lightning rods under the circumstances disclosed, was within the regulating power of the State and not the subject of interstate commerce for the following reasons: (a) Because the affixing of lightning rods to houses, was the carrying on of a business of a strictly local character, peculiarly within the exclusive control of State authority. (b) Because, besides, such business was wholly separate from interstate commerce, involved no question of the delivery of property shipped in interstate commerce or of the right to complete an interstate commerce transaction, but concerned merely the doing of a local act after interstate commerce had completely terminated. It is true, that it was shown that the contract under which the rods were shipped bound the seller, at his own expense, to attach the rods to the houses of the persons who ordered rods, but it was not within the power of the parties by the form of their contract to convert what was exclusively a local business, subject to State control, into an interstate commerce business protected by the commerce clause. It is manifest that if the right here asserted were recognized on the power to accomplish by contract what is here claimed, were to be upheld, all lines of demarcation between National and State authority would become obliterated, since it would necessarily follow that every kind or form of material shipped from one State to the other and intended to be used after delivery in the construction of buildings or in the making of improvements in any form would or could be made interstate commerce."

In the case of State ex rel. v. Greenfield, 205 S. W. 619, l. c. 620, regarding a similar contention, this language was used:

"Clearly the defendant is not engaged in interstate commerce, but in razing and improving buildings and

general construction, and in building fireproof ceilings, partitions, elevators and dumb-waiter shafts, etc. In the very nature of things the business of the company engaged in such constructions must of necessity be fixed and local where the work is done. It might as well be contended that a farmer is engaged in interstate commerce because he imports his seed and machinery used on the farm from another State, as to say that the defendant is engaged in interstate commerce because it imported some or all the materials it used in the construction of the concrete work mentioned in the record.

"Such shipments are purely incidental to the real business of the company; in the very next contract it obtains it may not be necessary to import a pound of material from another State. This defendant is not engaged in purchasing and shipping cement and lumber from one State to another for commercial purposes, but is engaged in the construction of building elevators, dumb-waiters, shafts, etc., throughout the country, in which various kinds of materials are used, some of which may or may not be imported from a State different from the one in which the work is being done. That the defendant is not engaged in interstate commerce is too plain for further argument."

The question may be well shown by one of Mr. Benjamin's illustrations as the distinction between the sale of an article of merchandise and a contract for material furnished and work and labor performed.

In discussing the Statute of Frauds he said in substance, that if a person agrees to purchase a suit of clothing at a price in excess of that provided for by the statute, unless the contract was evidenced by writing, signed, etc., the contract of sale would be void in the absence of such writing, but upon the other hand if a person should go into a tailor shop and order a suit of clothing to be made for him out of a designated piece of cloth, even though the price should exceed the statutory amount, then the contract would be valid and binding,

because the contract was for material to be furnished and work and labor to be performed—the former being purely a contract of sale of a completed manufactured article, while the latter would be a contract to manufacture the article for the person designated; and I suppose the former contract would not be valid even though the merchant should agree with the purchaser to make certain alterations of the suit in conformity to the wishes of the purchaser before it was to be delivered to him, but in the latter case no completed article exists and therefore it could not be sold as an article of commerce. It impresses me that the same is true of the case at bar; had the contract been that the appellant sold to the respondent a completed ice-making machine of twenty-five tons capacity daily, with nothing more save perhaps some minor article necessary to have made the delivery complete, the contract of sale would undoubtedly have been good, but that was not this contract; this contract bound the appellant to sell the ice-making machine to respondent, and in addition thereto, to furnish the material and labor which was necessary to erect the plant upon which the machine was to be erected, which required the furnishing of a considerable amount of material and much labor. The doing of the two latter things brings the case at bar within our statutes which requires a foreign corporation to take out a license in this State before it can do business herein. This I understand to be the ruling of the Supreme Court of the United States in Railway Signal Co. v. Virginia, supra, and Browning v. Waycross, supra, and we note the same difference in the case of State ex rel. v. Greenfield Co., supra.

There are many other cases of like import which are as follows: St. Louis v. Parker-Washington Co., 271 Mo. 229-242, 196 S. W. 767-770; Wichita F. & S. Co. v. Yale, 194 Mo. App. 60, 184 S. W. 119; Buffalo Refrigerating Mach. Co. v. H. & P. Co., 178 Fed. 696; St. Louis F. P. Co. v. Beilharz, 88 S. W. 512; S. R. Smyth Co. v. Ft. Worth Co., 105 Tex. 8, 142 S. W. 1157, 128 S. W.

1136; Buhler v. Burrowes Co., 171 S. W. 791; General Railway Signal Co. v. Commonwealth, 118 Va. 301, 87 S. E. 598; Hastings Indus. Co. v. Moran, 143 Mich. 679, 107 N. W. 706; Imperial Curtain Co. v. Jacob, 163 Mich. 72, 127 N. W. 772; American Amusement Co. v. Lake Chutes Co., 174 Ala. 526, 56 So. 961; Muller Mfg. Co. v. Dothan Bank, 176 Ala. 229, 57 So. 762; Nickerson v. Warren City Tank Co., 223 Fed. 843.

If we correctly understand the rulings of the Supreme Court of the United States, and of the various states of the Union regarding this question, the judgment of the circuit court should be affirmed; and it is so ordered. All concur.