## PALMER v. AEOLIAN CO.

### No. 8978.

Circuit Court of Appeals, Eighth Circuit.

Jan. 12, 1931.

Rehearing Denied Feb. 18, 1931.

A. G. Bush, of Davenport, Iowa (Curtis Bush, of Davenport, Iowa, on the brief), for appellant.

Wayne G. Cook, of Davenport, Iowa (Messrs. Lane & Waterman, of Davenport, Iowa, on the brief), for appellee.

Before KENYON and GARDNER, Circuit Judges, and MUNGER, District Judge.

MUNGER, District Judge.

Appellant, as the plaintiff below, brought suit against the appellee, as the defendant, to recover a sum of money which the plaintiff had paid to the defendant. From a judgment in favor of the defendant this appeal is prosecuted.

The plaintiff and defendant had made a written contract, by whose terms the defendant was to build a pipe organ for plaintiff, to deliver it on board cars in New Jersey, and to install it in a designated theater at Davenport, Iowa. The plaintiff agreed to pay $150,000 for the organ, and paid one-tenth of the purchase price when the contract was signed. Some months afterwards the plaintiff notified the defendant that he would not accept the organ and afterwards brought this suit to recover from the defendant the money which he had paid. In his petition he claimed that the contract was void because it was made in Iowa and the defendant, a foreign corporation, had not complied with the laws of Iowa requiring a permit for such a corporation to do business in the state and because the contract was indefinite. The defendant's answer, in addition to denials, admitted the making of the written contract and admitted that it had not obtained a permit to do business in Iowa, but alleged that the contract covered a lawful transaction in interstate commerce and denied that it transacted business in Iowa in violation of the laws of the state. The answer admitted that the defendant had received the $15,000 in pursuance of the contract, and that the organ was not constructed or erected, but alleged that the defendant had always been ready to perform its contract and was prevented from doing so only by the acts and omissions of the plaintiff and that the plaintiff had abandoned his plans for the erection of the building in which the organ was to be installed. The case was tried to the court, a jury trial having been waived by a stipulation in writing. The court filed a memorandum opinion and dismissal of the plaintiff's petition, but later, and at the same term, made specific findings of fact. These findings may be considered on this appeal (South Utah Mines v. Beaver County, 262 U. S. 325, 43 S. Ct. 577, 67 L. Ed. 1004), but under the provisions of sections 649 and 700 of the Revised Statutes (28 U. S. Code, §§ 773, 875 [28 USCA §§ 773, 875]) the only questions properly presented for review are the sufficiency of the pleadings and of the special findings to support the judgment, and rulings as to the offer of testimony of a witness, made during the trial. Lewellyn v. Elec. Reduction Co., 275 U. S. 243, 48 S. Ct. 63, 72 L. Ed. 262; Fleischmann Co. v. United States, 270 U. S. 349, 46 S. Ct. 284, 70 L. Ed. 624; Tyre & Spring Works Co. v. Spalding, 116 U. S. 541, 6 S. Ct. 498, 29 L. Ed. 720; The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84; Tatum v. Davis (C. C. A.) 283 F. 948; Randle v. Barnard (C. C. A.) 81 F. 682; City of Mankato v. Barber Asphalt Paving Co. (C. C. A.) 142 F. 329.

The court found that the defendant, a corporation organized under the laws of Connecticut, made a written contract on November 3, 1924, at Davenport, Iowa, with the plaintiff, a resident of Iowa. By the terms of the contract the defendant agreed to build and to deliver f. o. b. cars at Garwood, N. J., an Aeolian pipe organ, according to written specifications and general details of construction made a part of the contract, "of the

highest attainable standard in both workmanship and material, and to erect the same" in the Kindt theater at Davenport, Iowa, on or before August 1, 1926. The court found that the plaintiff was then planning to build such a theater, but that it was never built. The court found that it was supposed that this pipe organ would be the largest in the world and would require a year for its manufacture and four to six months for its installation. The plaintiff notified the defendant on April 24, 1925, to do no work on the organ. The court found that there had been no abandonment of the contract and no inability of the defendant to manufacture and install the organ according to the contract. The specifications, made a part of the contract, began with this recital: "Specifications for an Aeolian Pipe-Organ prepared for the Kindt Theater, Davenport, Iowa. Grand six-manual symphonic Duo-Art Aeolian Pipe-Organ containing open diapason pedal stop of 64' pitch. Compass of Manuals CC to $C^4$ 61 keys. Compass of Pedals CCC to G 32 keys." The specifications then number and list 303 items. The general details of construction, included in the contract, provided for the location of the organ and a console, with accessories, the furnishing, by the defendant, of an electric blowing plant, and a low voltage generator. The plaintiff agreed to prepare the organ chamber and blower room and to furnish some accessories for the use of the organ.

The contract provided that if the organ chamber or theater was not in condition to receive the organ four months prior to the installation date, the purchaser should accept shipment of the organ, that the organ should be at the risk of the purchaser against damage by fire or water after its arrival on the premises, and that the title ownership of the organ should remain in the seller until it was fully paid for. The court found that the defendant at the time the contract was made had not applied for or obtained a permit in Iowa to do business as a corporation nor had it complied with the laws of Iowa relating to that subject.

The statutes of Iowa required that a foreign corporation desiring to do business in Iowa shall file a copy of its articles of incorporation with the secretary of state, and shall authorize services of process to be made on certain persons within the state. It is further provided that no corporation shall exercise any of the rights or privileges conferred on corporations unless it has complied with these requirements. There are also provisions denying a right to maintain suits, and providing for penalties and punishments. Code of Iowa (1924) §§ 8420, 8427, 8429, 8430, 8431.

Appellant claims that the contract was void, because of the making of the contract in Iowa, when the defendant was unqualified to do so, under the statutes. If the making of the contract was an act by which the parties were engaging in interstate commerce, these statutes of Iowa could have no application. Butler Bros. Shoe Co. v. United States Rubber Co. (C. C. A.) 156 F. 1. The first question, therefore, is the nature of the contract which was made. In Sioux Remedy Co. v. Cope, 235 U. S. 197, 35 S. Ct. 57, 59, 59 L. Ed 193, the court, in an error proceeding to a state court, considered a written contract, made in South Dakota, for the sale of merchandise, and providing for the shipment of the merchandise by the plaintiff from its place of business in Iowa to the defendants at their place of business and residence in South Dakota. A statute of South Dakota, in substance, prohibited any foreign corporation from transacting business in South Dakota until it had filed a copy of its articles of incorporation with the secretary of state, and further provided that no action by such a corporation could be maintained in the courts of the state on any contract made in the state unless it had appointed a resident agent upon whom process could be served, and unless copies of such appointment had been filed in certain public offices. The Supreme Court upheld the contract, saying:

"The contract and sale out of which the action arose were transactions in interstate commerce, and entirely legitimate notwithstanding the plaintiff's noncompliance with the state statute. International Text Book Co. v. Pigg, 217 U. S. 91, 30 S. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; Buck Stove Co. v. Vickers, 226 U. S. 205, 33 S. Ct. 41, 57 L. Ed. 189; Flint & Walling Mfg. Co. v. McDonald, 21 S. D. 526, 114 N. W. 684, 14 L. R. A. (N. S.) 673, 130 Am. St. Rep. 735."

In Buck Stove Co. v. Vickers, 226 U. S. 205, 33 S. Ct. 41, 57 L. Ed. 189, a statute of Kansas required foreign corporations to file statements as a prerequisite to doing business in that state. The statute was held to be invalid as to transactions in interstate commerce. In deciding the questions involved, the court quoted from a prior decision in International Text-Book Co. v. Pigg, 217 U. S. 91, 30 S. Ct. 481, 486, 54 L. Ed. 678, 27 L. R.

A. (N. S.) 493, 18 Ann. Cas. 1103, as follows:

"To carry on interstate commerce is not a franchise or a privilege granted by the state; it is a right which every citizen of the United States is entitled to exercise under the Constitution and laws of the United States; and the accession of mere corporate facilities, as a matter of convenience in carrying on their business, cannot have the effect of depriving them of such right, unless Congress should see fit to interpose some contrary regulation on the subject. * * *

"How far a corporation of one state is entitled to claim in another state, where it is doing business, equality of treatment with individual citizens in respect of the right to sue and defend in the courts, is a question which the exigencies of this case do not require to be definitely decided. It is sufficient to say that the requirement of the statement mentioned in § 1283 [section 1358, Gen. Stat. 1905] of the statute imposes a direct burden on the plaintiff's right to engage in interstate business, and therefore is in violation of its constitutional rights. It is the established doctrine of this court that a state may not, in any form or under any guise, directly burden the prosecution of interstate business. But such a burden is imposed when the corporation of another state, lawfully engaged in interstate commerce, is required, as a condition of its right to prosecute its business in Kansas, to make and file a statement setting forth certain facts which the state, confessedly, could not control by legislation. It results that the provision as to the statement mentioned in Sec. 1283 (Sec. 1358, Gen. Stat. 1905) must fall before the Constitution of the United States, and with it—according to the established rules of statutory construction—must fall that part of the same section which provides that the obtaining of the certificate of the secretary of state that such statement has been properly made shall be a condition precedent to the right of the plaintiff to maintain an action in the courts of Kansas."

The general rule of the lawfulness of a contract for a sale of an article in interstate commerce, although the contract is made within the state, as against a state statute forbidding contracts of that nature, is illustrated in Leisy v. Hardin, 135 U. S. 100, 10 S. Ct. 681, 34 L. Ed. 128, where a sale of intoxicating liquor in an original package which the seller had brought into the state was held to be valid notwithstanding the state law forbade such a sale, and in Schollenberger v. Pennsylvania, 171 U. S. 1, 18 S. Ct. 757, 43 L. Ed. 49, holding valid a sale within the state of a package of oleomargarine when sold by the agent of the importer in the package in which it was shipped into the state, although the state statute prohibited the manufacture and sale of such an article. In Fed. Trade Comm. v. Pac. States Paper Trade Ass'n, 273 U. S. 52, 47 S. Ct. 255, 258, 71 L. Ed. 534, the court said:

" 'Commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business.' Swift & Company v. United States, 196 U. S. 375, 398, 25 S. Ct. 276, 280, 49 L. Ed. 518. And what is or is not interstate commerce is to be determined upon a broad consideration of the substance of the whole transaction. Dozier v. Alabama, 218 U. S. 124, 128, 30 S. Ct. 649, 54 L. Ed. 965, 28 L. R. A. (N. S.) 264. Such commerce is not confined to transportation, but comprehends all commercial intercourse between different states and all the component parts of that intercourse. And it includes the buying and selling of commodities for shipment from one state to another. Dahnke-Walker Co. v. Bondurant, 257 U. S. 282, 290, 42 S. Ct. 106, 66 L. Ed. 239; Lemke v. Farmers' Grain Co., 258 U. S. 50, 55, 42 S. Ct. 244, 66 L. Ed. 458. The absence of contractual relation between the manufacturer and retailer does not matter. The sale by the wholesaler to the retailer is the initial step in the business completed by the interstate transportation and delivery of the paper. Presumably the seller has then determined whether his source of supply is a mill within or one without the state. If the contract of sale provided for shipment to the purchaser from a mill outside the state, then undoubtedly it would be an essential part of commerce among the states. Sonneborn Bros. v. Cureton, 262 U. S. 506, 515, 43 S. Ct. 643, 67 L. Ed. 1095.''

In the case cited of Sonneborn Bros. v. Cureton, 262 U. S. 506, 43 S. Ct. 643, 646, 67 L. Ed. 1095, the court said:

"Many of the sales by the appellants were made by them before the oil to fulfill the sales was sent to Texas. These were properly treated by the state authorities as exempt from state taxation. They were in effect contracts for the sale and delivery of the oil across state lines. The soliciting of orders for such sales is equally exempt. Such transactions are interstate commerce in its essence and any state tax upon it is a regulation of

it and a burden upon it. Robbins v. Shelby County Taxing District, 120 U. S. 489, 7 S. Ct. 592, 30 L. Ed. 694; Asher v. Texas, 128 U. S. 129, 9 S. Ct. 1, 32 L. Ed. 368; Stoutenburgh v. Hennick, 129 U. S. 141, 147, 9 S. Ct. 256, 32 L. Ed. 637; Caldwell v. North Carolina, 187 U. S. 622, 23 S. Ct. 229, 47 L. Ed. 336; Rearick v. Pennsylvania, 203 U. S. 507, 27 S. Ct. 159, 51 L. Ed. 295; Brennan) v. Titusville, 153 U. S. 289, 14 S. Ct. 829, 38 L. Ed. 719; Dozier v. Alabama, 218 U. S. 124, 30 S. Ct. 649, 54 L. Ed. 965, 28 L. R. A. (N. S.) 264; Crenshaw v. Arkansas, 227 U. S. 389, 33 S. Ct. 294, 57 L. Ed. 565; Stewart v. Michigan, 232 U. S. 665, 34 S. Ct. 476, 58 L. Ed. 786; Western Oil Refining Co. v. Lipscomb, 244 U. S. 346, 37 S. Ct. 623, 61 L. Ed. 1181."

■ Appellant claims that the contract did not provide for a sale in interstate commerce because of the provision in the contract that the organ should be delivered f. o. b. Garwood, N. J. But the contract also provided for the manufacture of the organ by the defendant, and for its installation by the defendant in a theater at Davenport, Iowa, for retention of title in the seller until final payment was made, and that risk of loss by fire or water was to be assumed by the purchaser after the arrival of the organ at the theater. The fact of an agreed delivery f. o. b. cars in New Jersey is one that must be considered in determining the nature of this contract, but it is not necessarily decisive. Considering the purpose the parties had in mind, of the final assembling and delivery of a completed organ in place in a theater at Davenport, it seems clear that a sale and delivery of the organ in interstate commerce was contemplated, and the provision for delivery free on board cars in New Jersey was a mere arrangement by which the purchaser agreed to pay the freight charges from Garwood to Davenport. Savage v. Jones, 225 U. S. 501, 32 S. Ct. 715, 56 L. Ed. 1182; Pennsylvania R. Co. v. Clark Bros. Coal Co., 238 U. S. 456, 35 S. Ct. 896, 59 L. Ed. 1406; Pennsylvania R. Co. v. Sonman Coal Co., 242 U. S. 120, 37 S. Ct. 46, 61 L. Ed. 188; Rawleigh Co. v. Walker, 117 Okl. 256, 246 P. 417; Reaves Lumber Co. v. Cain-Hurley Lumber Co., 152 Tenn. 339, 279 S. W. 257.

Appellant claims that some of the articles mentioned in the specifications could be procured in Iowa or elsewhere, and that the contract does not call for the shipment of these articles in interstate transportation, as the contract provides for the shipment from New Jersey of the pipe organ only. The parties by the terms of their contract, in effect, described the pipe organ as one embracing the several parts mentioned in the specifications, and there is nothing in the record to show that these parts are not essential to the completed organ contracted for. Appellant also claims that the contract should be subject to the Iowa statute, because the contract provided for the manufacture of the organ, and that manufacture is not commerce. The contract not only provided for the building of the organ but for its installation.

"Where the contract is for the sale of the article and for its delivery in another state, the transaction is one of interstate commerce, although the vendor may have also agreed to manufacture it in order to fulfill his contract of sale." Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 S. Ct. 96, 109, 44 L. Ed. 136.

Appellant also contends that the principal and essential thing contracted for was the installation of the organ in the theater in Iowa, that the installation was not such a part of the delivery of the organ as to be embraced within any interstate sale, and that the transaction should be governed by the principle announced in cases such as Browning v. City of Waycross, 233 U. S. 16, 34 S. Ct. 578, 580, 58 L. Ed. 828; General Railway Signal Co. v. Commonwealth of Virginia, 118 Va. 301, 87 S. E. 598, affirmed in 246 U. S. 500, 38 S. Ct. 360, 62 L. Ed. 854; Western Gas Const. Co. v. Commonwealth of Virginia, 147 Va. 235, 136 S. E. 646, 55 A. L. R. 717, affirmed in 276 U. S. 597, 48 S. Ct. 319, 72 L. Ed. 723. In Browning v. Waycross, it was held an agreement for the erection of lightning rods as a part of a contract for the sale of the rods in interstate commerce was an act of mere local business within the state, and subject to the control by state authority. In General Railway Signal Co. v. Virginia, 246 U. S. 500, 38 S. Ct. 360, 62 L. Ed. 854, it was held that a corporation of New York was subject to a local law of Virginia because it was doing business in that state separate from interstate commerce. It appeared that the corporation made a contract to furnish material and labor and to install and erect an extensive railway signal system. In Western Gas Const. Co. v. Commonwealth of Virginia (affirmed in a memorandum opinion in 276 U. S. 597, 48 S. Ct. 319, 72 L. Ed. 723, on the authority of Browning v. Waycross and General Railway Signal Co. v. Commonwealth of Virginia), the construction company had made a contract for the sale of gas machines and equipment which included an agreement

for their installation. The construction work required was so extensive that the court was of the opinion that the sale was an incident of it, rather than that the construction was an incident of the sale, and that whatever supervision of the work was required could have been done by experts other than those of the seller.

In the Browning Case, the Supreme Court reserved the question whether an installation in a state of an article sold might be a part of the sale and delivery in interstate commerce "where, because of some intrinsic and peculiar quality or inherent complexity of the article, the making of such agreement was essential to the accomplishment of the interstate transaction." In York Manufacturing Co. v. Colley, 247 U. S. 21, 38 S. Ct. 430, 432, 62 L. Ed. 963, 11 A. L. R. 611, a contract was involved by which a Pennsylvania corporation had contracted for the sale of an ice making plant to a resident of Texas, the parts of the plant to be shipped to Texas where it was to be assembled and erected under the supervision of an expert sent by the seller. In determining that the work done in Texas did not subject the Pennsylvania Corporation to the laws of Texas requiring a permit to do business in that state by foreign corporations, the court stated the principles which should govern:

"As, in the second place, since the ruling in McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, there has been no doubt that the interstate commerce power embraced that which is relevant or reasonably appropriate to the power granted, so also from such doctrine there can be no doubt that the right to make an interstate commerce contract includes in its very terms the right to incorporate into such contract provisions which are relevant and appropriate to the contract made. The only possible question open therefore is: Was the particular provision of the contract for the service of an engineer to assemble and erect the machinery in question at the point of destination and to practically test its efficiency before complete delivery relevant and appropriate to the interstate sale of the machinery? When the controversy is thus brought in last analysis to this issue there would seem to be no room for any but an affirmative answer. Generically this must be unless it can be said that an agreement to direct the assembling and supervision of machinery whose intrinsic value largely depends upon its being united and made operative as a whole is not appropriate to its sale. The consequence of such a ruling if made in this case would be particularly emphasized by a consideration of the functions of the machinery composing the plant which was sold, of its complexity, of the necessity of its aggregation and unison with mechanical skill and precision in order that the result of the contract of sale—the ice plant purchased —might come into existence. In its essential principle therefore the case is governed by Caldwell v. North Carolina, 187 U. S. 622, 23 S. Ct. 229, 47 L. Ed. 336; Rearick v. Pennsylvania, 203 U. S. 507, 27 S. Ct. 159, 51 L. Ed. 295, and Dozier v. Alabama, 218 U. S. 124, 30 S. Ct. 649, 54 L. Ed. 965, 28 L. R. A. (N. S.) 264. In fact those cases were relied upon in the Waycross Case as supporting the contention that a mere agreement for the erection of lightning rods in a contract made concerning the shipment of such rods in interstate commerce caused the act of erection to be itself interstate commerce. But the basis upon which the cases were held to be not apposite, that is, the local characteristic of the work of putting up lightning rods, not only demonstrates beyond doubt the mistake concerning the ruling as to the Waycross Case which was below committed, but serves unerringly to establish the soundness of the distinction by which the particular question before us is brought within the reach of interstate commerce.

"Of course we are concerned only with the case before us, that is, with a contract inherently relating to and intrinsically dealing with the thing sold, the machinery and all its parts constituting the ice plant. This view must be borne in mind in order to make it clear that what is here said does not concern the subject passed on in General Railway Signal Co. v. Virginia, 246 U. S. 500, 38 S. Ct. 360, 62 L. Ed. 854, since in that case the work required to be done by the contract over and above its inherent and intrinsic relation to the subject-matter of the interstate commerce contract involved the performance of duties over which the state had a right to exercise control because of their inherent intrastate character. In fact the case last referred to when looked at from a broad point of view is but an illustration of the principle applied in the Waycross Case to the effect that that which was inherently intrastate did not lose its essential nature because it formed part of an interstate commerce contract to which it had no necessary relation. And this truth by a negative pregnant states the obverse view that that which is intrinsically interstate and immediately and inherently connected with interstate commerce is entitled

to the protection of the Constitution of the United States resulting from that relation."

In applying the principles of these cases to the interpretation of the contract in this case, we may consider the contract for the organ and a description of the organ itself as set out in appellant's brief.

"It contains seven pages of specifications besides including a lot of things that are not specified. It calls for 8972 separate pipes, some of wood and some of metal, and some apparently fitted with reeds. These pipes range in size from the smallest such as the flute, fife, etc., up to the 64 foot diapason— the largest pipes ever specified for an organ. It would take for the largest wood pipe alone as much wood as would be necessary to floor a large dance floor about 64′ x 64′ in size.

"The contract provides for 840 additional notes which are apparently produced by duplicating connections. It also provides for 430 percussion tones such as tower bells, orchestra bells, cathedral chimes, harps, glockenspiel, marimba, four drums, two grand pianos, etc., or a total of 9,505 separate tone producing elements, necessitating at least 9,505 separate magnets to operate them and the wiring connections to which such magnet would be connected.

"The contract calls for 131 stops, six banks of keys, 61 in each bank, or a total of 366, and 32 pedals played by foot with 29 couplers, 48 pistons, wind chests, blowing plant, electric generator, and the automatic duoart organ would require at least 398 pouches or bellows, assuming that there would be one for each key or pedal on the six manuals and pedal parts."

There was to be what is called a great organ, an antiphonal organ located in an organ chamber two hundred and forty feet distant from the great organ, and the echo organ was to be located eighty to eighty-five feet from the main floor of the building. The specifications enter into elaborate detail in describing the many parts.

The findings do not show that the organ could have been assembled or installed by any others than employees of the defendant the Aeolian Company. It seems obvious that the value of such an organ would depend upon its being so installed that the purpose of the sale would be made effective. It would also seem to be obvious that in the case of such an instrument, which was to accomplish not only a mechanical result, but also an artistic success, that particular emphasis must be given, as the Supreme Court said was required in considering the contract for the sale of the ice machine, to a consideration of the functions of the organ machinery, of its complexity, of the necessity of its aggregation and unison with mechanical skill and precision in order that the result of the sale might come into existence. The relationship of the installation of similar pipe organs to this sale is thus stated in a recent case, Aeolian Co. v. Fischer (C. C. A.) 40 F.(2d) 189, 190:

"The agreement of the organ manufacturer to install is not only relevant and appropriate to the interstate sale but is essential if an organ, as distinguished from its parts, may be sold at all. The thing sold is a musical instrument, complete in itself. * * * Without descending to mechanical description it may be said that the work of installation is of the most vital importance in the construction of the completed organ, and requires in its performance not only the highest mechanical skill but a thorough understanding of the methods employed by the manufacturer in the arrangement of mechanical and electrical connections. * * * Whatever distinctions may be drawn in doubtful cases, it is clear that the instant case is governed and controlled by the decision in the ice machine case (York Mfg. Co. v. Colley, 247 U. S. 21, 38 S. Ct. 430, 62 L. Ed. 963, 11 A. L. R. 611). The distinction there drawn between the setting up of lightning rods (Browning v. Waycross, 233 U. S. 16, 34 S. Ct. 578, 58 L. Ed. 828) and the installation of an ice machine shows that the contracts here in question for the construction and installation of organs clearly involve interstate commerce not only in the manufacture and shipment of the organ, but in its installation after arrival within the state."

A full consideration of the facts shown by the pleadings and findings in this case leads to the conclusion that the making of the contract in question was so much an appropriate part of a sale of goods in interstate commerce that the statutes of Iowa which have been cited were not applicable and that the corporation legally executed the contract.

The appellant also urges that the contract was so indefinite as to not be enforcible. He admits that as to some items of the specifications, which are claimed to be uncertain, it is necessary to resort to the evidence. As has been stated, this court is limited to the pleadings and findings of the court below, and therefore it may not consider whether or not the evidence supports the findings, nor can this court make further findings. This court is asked to take judicial notice that some of the parts to be furnished by the defendant

are of such a character that there must be many kinds of them, such as drums, cymbals, marimbas, and glockenspiel; also, that the organ would require electric wiring and electrical connections; and that the contract is silent as to the type of wiring to be used. A reasonable certainty is all that is required in the terms of a contract (1 Elliott on Contracts §§ 170, 178), and we do not find a lack of such reasonable certainty on the face of the contract. Parol evidence would be admissible to show the meaning of technical terms. And the specifications of a "Grand Six Manual Symphonic Duo Art Aeolian Pipe Organ" might be shown of itself, to refer to some well known and definite article which was in the contemplation of the parties when the contract was signed. Evidence is receivable to identify the subject-matter of a contract. 1 Williston on Contracts, § 179; 4 Wigmore on Ev. § 2465. Even if the contract were indefinite as to some items, it must appear that such items were so essential to the contract that it would be unfair to enforce the remainder. 1 Williston on Contracts, § 48. No such fact appears.

The only other objections that can be noticed relate to the testimony of a witness for the plaintiff, who testified that he had been a builder of pipe organs. His attention was called to a specification in this contract of a certain diapason pipe, and he was asked as to what descriptions of such pipes in common use in pipe organs such a specification would apply. Appellant stated that it was the intention to prove that there were at least two different pipes that might be included within the terms of that specification. Similar questions were asked as to two other items, but the evidence was excluded as immaterial. There was no error in those rulings. The contract called for items such as were stated in this portion of the specifications, but it also provided that the organ was to be built according to the specifications and of the highest attainable standard in both workmanship and materials. The questions put to the witness did not ask for his opinion whether there were several articles that would both answer to the description in the part of the specifications stated to him, and also be of the highest attainable standard in workmanship and materials. The parties had contracted for items of that quality and a plenitude of items which only partly corresponded to those agreed to be furnished was not a material subject of inquiry.

No reversible error is found in the record, and the judgment will be affirmed.