THE STATE v. SHELL PIPE LINE CORPORATION, a Corporation, Appellant.—139 S. W. (2d) 510.

Division Two, May 4, 1940.

*Thompson, Mitchell, Thompson & Young, Robert Neill, Jr.,* and *C. P. Berry* for appellant.

*Roy McKittrick,* Attorney General, and *Max Wasserman;* Assistant Attorney General, for respondent; *Harry G. Waltner, Jr.,* of counsel.

COOLEY, C.—Action by the State of Missouri to recover of defendant, appellant, corporation franchise tax for the year 1934. Judgment for the plaintiff, State of Missouri, for $2800 tax and $1000 interest, from which defendant appeals. The facts are agreed. Appellant in its brief has presented a statement of facts with which respondent says it is content. Most of the facts involved are shown by a stipulation filed at the trial. Some other facts to which it may be necessary to refer are shown by oral evidence, the truth of which is not disputed. We, therefore, take the facts as agreed upon. In order to make clear the situation and the legal issues involved it will be necessary to quote most of the statement of facts, summarizing only where that may be done without destroying clarity:

"The amended petition was drawn to recover said tax in the amount of $2,800 on the theory that defendant is 'engaged in business in this state.'

"The answer . . . to said petition denied that defendant was engaged in business in this State within the meaning of the section of the statutes above mentioned and set up the defenses that said statute does not apply to defendant nor to its business, and that if said statute is attempted to be applied to defendant, the same is unconstitutional because defendant is engaged solely in transacting business in interstate commerce, and, as applied to this defendant, said statute would impose a burden upon interstate commerce in violation of Article I, Section 8, Clause 3, known as the Commerce Clause, of the Constitution of the United States, and in violation of Section 1 of the Fourteenth Amendment to said Constitution, which prohibits the states from depriving any person of property without due process of law, and which prohibits every state from denying to any person the equal protection of the laws, and in violation of Section 30 of Article II of the Constitution of Missouri, which provides that no person shall be deprived of property without due process of law. Said answer further sets up that by reason of the facts above stated, the tax bill on which the suit is founded, and the attempted assessment of said tax are void.

"Defendant also filed a cross petition . . . setting up substantially the same facts stated in the above mentioned answer, the prayer of which was to deny recovery under plaintiff's petition and for a decree setting aside and annulling the assessment of the franchise tax for the year 1934, canceling the tax bill, declaring said tax invalid, and that the tax and any penalty and any interest thereon do not constitute a lien on the property and assets of defendant in the State of Missouri.

"A motion to dismiss and answer . . . to defendant's cross bill were filed by the plaintiff. The answer or reply to defendant's cross bill consisted of a general denial, and further alleged that the affairs of defendant and of the Shell Petroleum Corporation, which latter company is doing an intrastate business and conducting a business of selling gasoline and petroleum products at retail in this State and paying a franchise tax to the State, are so conducted, mingled and combined and directed that corporate entity should be disregarded for the purposes of this suit.

"A jury was waived and the cause tried before the judge. . . .

"There was testimony by a member of the State Tax Commission that the assessment of $2800 against defendant as a franchise tax for the year 1934 was made on a valuation of the assets of defendant 'as found by the Commissioner,' which valuation was $5,600,000. A certified copy of the assessment of this tax was introduced as Plaintiff's Exhibit A, the same being attached to plaintiff's petition. . . .

## "STIPULATION OF FACTS.

"The parties entered into a stipulation of facts in writing and filed the same in the trial court at the time of the trial. The facts stipulated are as follows:

"Formerly defendant's name was Ozark Pipe Line Corporation, which name was changed to Shell Pipe Line Corporation in the year 1927.

"The defendant is a foreign corporation, incorporated and existing under the laws of Maryland. Under date of January 9, 1920, defendant was issued a license by the Secretary of State of the State of Missouri 'to engage in the State of Missouri exclusively in the business of transporting crude petroleum by pipe line. . . .' This license was issued to defendant in its former name of Ozark Pipe Line Corporation.

"On July 9, 1928, defendant filed with the Secretary of State of the State of Missouri an 'Affidavit of Extension of Business Purposes,' to include the business of:

" 'To locate, construct, maintain and operate pipe lines for the transportation of petroleum and petroleum products; to obtain rights of way for said pipe lines; to transport petroleum and petroleum products by pipe line; and to erect, maintain and operate telegraph and telephone lines to be used in connection with the maintenance and operation of said pipe lines and for purposes incident thereto.'

"It was the purpose of defendant, in applying for and receiving the license to engage in business in Missouri, to secure the power of eminent domain in order to condemn rights of way for its pipe line, and to enable it to negotiate more advantageously for the purchase of rights of way. Defendant has exercised the power of eminent domain for said purpose in Missouri on several occasions.

"Defendant did not report to the State Tax Commission for franchise tax purposes for the year 1934 . . . , under the provisions of Section 4642, R. S. Mo. 1929.

"Defendant owns and operates a system of pipe lines situated in a number of states, including Texas, Kansas, Oklahoma, Missouri, Illinois and Indiana. Its business is solely that of a common carrier of petroleum for others for hire. It has always kept on file with the Interstate Commerce Commission at Washington, D. C., its tariffs—schedules and rates—for the transportation of petroleum in interstate commerce, and in all respects has complied with the Federal Transportation Act relating to pipe line carriers, and has complied with all rules and orders of the Interstate Commerce Commission.

"Defendant does not produce, buy, sell or own any petroleum, except a small amount which it purchases for fuel for use at its pump stations.

"Defendant receives no petroleum in Missouri for transportation, and delivers none in Missouri. The petroleum transported by it across the State of Missouri is received by it in Oklahoma and states other than Missouri, and transported by it entirely across the State of Missouri and delivered in Illinois and Indiana. . . .

". . . All petroleum transported through the pipe line in Missouri moves . . . from some point in Oklahoma across the State of Missouri into Illinois, a portion of which is delivered at Wood River, Illinois, and the balance moves on to East Chicago, Indiana. (Here are mentioned six pumping stations in Missouri.) These stations are used to pump the petroleum through the pipe line to its destination. The line consists of one ten-inch pipe extending entirely across the State of Missouri, together with another ten-inch pipe laid parallel to the first one and which extends the greater distance between the several stations. . . . Except in case of accident, petroleum flows continuously through both lines of pipe; the two lines of pipe constituting one pipe line. . . .

"The telegraph and telephone line owned and operated by defendant in connection with the operation of its pipe line extends entirely across the State of Missouri, and, generally speaking, is on the pipe line right of way. Defendant has a telegraph station at St. Louis, but no other such station in the State of Missouri. . . . The telephone line is used for communication between St. Louis and various other offices of defendant maintained in connection with the operation of its pipe line, and with the pipe line pumping stations. . . .

"All of the stock of defendant corporation, except qualifying shares, is owned by the Shell Union Oil Corporation, a Delaware corporation. All of the stock, except qualifying shares, of Shell Petroleum Corporation, a Virginia corporation, is owned by the Shell Union Oil Corporation.

"Defendant maintains an office at 10 Light Street, Baltimore, Maryland, which is in charge of the Corporation Trust Company. This is a statutory office required to be kept under the laws of Maryland. Whatever business is necessary to be transacted at this office is handled by an employee or employees of the Corporation Trust Company. Meetings of stockholders are held in Baltimore, Maryland, and meetings of directors are held in either St. Louis or New York. Policies of the company are sometimes determined at the St. Louis Office and sometimes at the New York office, the latter being at the office of the Shell Union Oil Corporation.

"Defendant maintains its principal office at St. Louis, Missouri. All financial records, personnel records and corporation records are kept at this office. Payments from customers on account of transportation contracts are received and accepted at this office. All checks or drafts in payment of wages, material, supplies, taxes, insurance, and the greater portion of other expenses are issued at defendant's St. Louis office.

"The funds of the defendant are deposited in a St. Louis bank. The secretary of the corporation has charge of the books and records, and keeps them, together with the stock transfer books, at the office at St. Louis. All dividends paid on the stock of the company are paid from the St. Louis office.

"The St. Louis office of defendant is on the eighth floor of the Shell Building, Thirteenth and Locust streets, . . . The building is owned by Shell Petroleum Corporation. Forty-four (44) persons are employed by defendant at this office. There are several departments of the Shell Petroleum Corporation . . . , which also render some service to defendant, although the greater portion of the time of the employees of these departments is devoted to the business of Shell Petroleum Corporation. Defendant pays only for the time of said employees which is devoted to its work.

"The officers and directors of defendant are also officers and directors of Shell Petroleum Corporation. These are thirteen in number, and of these thirteen six are officers or directors of Shell Union Oil Corporation.

"Defendant's manager's office is at the St. Louis office of the defendant.

"The real estate owned by defendant in the State of Missouri consists of property acquired as rights of way for its pipe line and (six) sites for pumping stations. At each pumping station site are located the main pump house and auxiliary building and other buildings. There are two tanks at each pumping station, one of 1,000-barrel capacity and one of 37,500-barrel capacity. When everything is in normal working order the oil goes to a pumping station and then directly through the pumps. The smaller tank is in constant use in this connection. If the oil is flowing to the pumping station faster

than it is being pumped out, the surplus accumulates in the smaller tank and thereby gives notice to the engineer in charge of that fact and he speeds up the pumping operations at his station sufficiently to prevent the oil from so accumulating and to keep it flowing on at the same rate that it is coming into his station. If his station is pumping at a rate in excess of that necessary to carry the oil that is coming to his station, no oil will accumulate in this tank and the engineer seeks to adjust his pumping operations accordingly. The larger tank is used only in case of emergency. If, for instance, a leak should occur in the pipe between Oetters Station and Wood River, so that normal carriage could not be maintained through that portion of the line, the large tank at Oetters Station could be used to receive oil until normal conditions could be restored. If, in these circumstances, the large tank at Oetters Station should become full the tank at the next station toward the southwest could then be used for the same purpose. The large tanks are used in such circumstances so that the normal operation of the whole line may not be interfered with. There are other paraphernalia, such as water tanks, etc., used in connection with the operation of each station. There are on each of these station properties several residence houses owned by defendant for use by its employees. These houses are only for the purpose of having places to live for the employees so that they may not have to live inconvenient distances from the pumping stations, and so that they will be immediately available in case of accident or other emergency. There are a total of forty-one of these houses on the pumping station properties in Missouri. The employees occupying these houses pay rent to the defendant monthly; the total monthly rental received for all of these houses is $216.00. . . .

"The employees at each of the pumping stations in Missouri, . . . , consist of one chief engineer, five engineers, six oilers, one yardman truck driver, and one line walker. In addition to these employees defendant has the following employees whose duties relate to the entire line in Missouri: One division superintendent, one mechanical maintenance supervisor, one mechanical maintenance laborer, three maintenance foremen, three maintenance caulkers, fourteen maintenance laborers, and one maintenance truck driver. Defendant also has employed in connection with its telephone and telegraph line, . . . , one division superintendent, three telephone foremen, one maintenance foreman, two maintenance linemen, and one truck driver. The number of employees mentioned above in this paragraph total 116.

"Exhibit E shows that in connection with its pumping stations and its pipe line and telephone and telegraph lines in Missouri defendant owns and uses five Ford trucks, two one-half ton Dodge trucks, four one and one-half ton Dodge trucks, three Chevrolet

trucks, one Dodge coupe, one Chevrolet coupe, and one Oldsmobile sedan.

"The land owned by defendant at each of the pumping stations and the improvements thereon are set out in the stipulation.

"Defendant rents to Ajax Pipe Line Company space for two wires on defendant's telephone poles for a distance of 240.6 miles between a point two miles east of Racine, Missouri, to Boles, Franklin County, Missouri, for which defendant receives annual rental from Ajax of $6.00 per wire mile, the total wire mileage (there being two wires for a distance of 240.6 miles) being 481.2. These wires are used by Ajax Pipe Line Company in the State of Missouri in connection with its transportation of oil in interstate commerce.

"During the year 1934 defendant carried through the State of Missouri only oil belonging to Shell Petroleum Corporation. . . .

"Defendant has always been assessed, and has always paid annually, general property taxes upon all of its property in the State of Missouri, and has also paid the annual registration fee of $5.00.

"The assessment of the tax in question was made by the State Tax Commission in the month of November, 1934, and no question is raised about the procedure followed by the State Tax Commission in this regard.

"All of the facts stated in the stipulation were true during the entire year of 1934.

"The exhibits attached to the stipulation appear on pages 48 to 72, inclusive, of the abstract." [End of stipulation of facts.]

### "OTHER EVIDENCE.

"Plaintiff offered in evidence, over objection by defendant's counsel, its Exhibit B, the same being the anti-trust affidavit filed by defendant with the Secretary of State which was executed on July 24, 1933. This was offered on the theory that it contained an admission by the defendant that it 'has done business in the State of Missouri.'

"Plaintiff introduced in evidence, over objection of defendant's counsel, its Exhibit C, same being an affidavit of a principal agent or officer, filed in behalf of defendant by Mr. Carl Barker as principal officer, pursuant to demand by the Secretary of State, the same being in statutory form. In this affidavit it was stated that the property located and business transacted in Missouri for the period covered by the affidavit was $5,442,445.45. This affidavit was sworn to on February 16, 1932.

"A transcript of the testimony of R. F. Smith, in behalf of defendant, was introduced by agreement of the parties, to be received the same as if the witness were present and testifying. . . . His testimony was as follows:

" 'I have been manager of Shell Pipe Line Corporation for four and one-half years. I have been with defendant corporation for more

than twenty years. Defendant buys oil for fuel for its pumping stations both within and outside of Missouri.

" 'Shell Pipe Line Corporation has no business other than the transportation of petroleum. It carries oil principally for Shell Petroleum Corporation. There is no written contract covering the carriage of oil. The oil is offered to defendant under its published tariffs on file with the Interstate Commerce Commission. It carries oil under the terms of these published tariffs.

" 'When some other company or individual wants to transport oil, they make inquiry as to whether or not defendant can handle it—as to time, point of origin and destination. If defendant can do so, it is asked to make the shipments. Defendant advises them of the situation and then they offer the oil. When oil is received for transportation, defendant issues to the consignor what is known as a "run ticket," which shows the amount of oil being transported, the base sediment and gravity. That is the only thing in writing issued by defendant.

" 'Concerning the rental of pole space to the Ajax Pipe Line Company, this is in Missouri for the entire distance. No new contract is made each year. The contract was for a primary term of five years, automatically renewing itself for one year periods unless canceled by either party on the fifth anniversary or any subsequent anniversary.

" 'Defendant has no executive office outside of Missouri and Maryland. It has division offices at several points which are concerned only with the mechanics of the operation of the line.

" 'The majority of defendant's office employees are employed at the St. Louis office, and in accounting for the entire system. There is a superintendent of telephone and telegraph, who has supervision of the entire system. There are two draftsmen for keeping up the mapping, etc. All of their duties relate to the pipe line and the carrying of petroleum through it.

" 'As to the use of trucks and other automobiles mentioned in the stipulation: There is one at each station to take care of the transportation around that station hauling groceries and supplies for the men and hauling material back and forth between stations—between stations and railroad points, or delivering material to a certain point on the pipe line for maintenance work. The maintenance gang also have trucks for hauling the men and tools, and the telephone men each have a car for transportation to find trouble and for inspection of the telephone lines.

" 'The telephone and telegraph line is used in connection with the operation of transporting petroleum. . . .

" 'It takes five engineers and five oilers at each pumping station, and there is usually an odd man, and a combination yard man and truck driver.

" 'There are maintenance men for the pipe line, and maintenance men for the telephone line. . . .

" 'As to why defendant has employees living in the company-owned houses at pumping stations: These pumping stations are all in isolated localities—they are somewhat removed from a location where these employees could rent houses; emergencies; might come up where we need to call extra help—where a man is hurt or sick or fails to show up when his shift comes around. So these houses are built so the men might be subject to call at any time. While the majority of these houses are five-room houses, there are some smaller. They are of modern construction. The men living in them pay rent. For a five-room house they pay $5.00 a month, for a four-room house $6.00 (obviously an error) a month, and for a three-room house $3.00 a month. Prior to a few years ago the men did not pay rent for these houses. The reason that we charged rent, there appeared to be a discrimination against those to whom houses could not be furnished, so the rule was inaugurated that all employees living in company-owned houses must pay rent to equalize the situation. The rental is purely nominal.

" 'The contracts of hire of some of the employees in Missouri are made in Missouri and the balance are made in Cushing, (Okla.). There is no written contract of employment. Contracts relating to anything in the way of construction in connection with the telephone lines or pipe lines, are approved in St. Louis. A contract for the construction of a tank at one of the pump stations would be executed in St. Louis. . . .

" 'All oil is transported through Missouri for the Shell Petroleum Corporation under the tariffs—there are no contracts. All oil transported through Missouri during the years 1934 and 1935 was for Shell Petroleum Corporation, going to its refineries at Wood River, Illinois, and East Chicago, Indiana.

" 'If a man wants to ship oil he either writes a letter or comes to see us, or we go to see him, or he calls us up over the telephone, and asks us what the condition of the tariff through our line is. We do not give a bill of lading; we give what is known as a "run ticket", which is a receipt for the crude received. The giving of these run tickets is fixed by act to regulate interstate commerce, which provides that shipper shall be given a receipt or a run ticket, a receipt or a bill of lading. These receipts are made out and given to the shipper at Cushing, (Okla.). He does not get any written contract from us in St. Louis at all. . . .

" 'We have our main office in St. Louis, Missouri, and have a bank account in the Mississippi Valley Trust Company in St. Louis. That is the one through which we handle our pay roll. . . .

" 'The value of the defendant's entire system as of June 1, 1934,

in all states was $63,159,849.88. The gross income between June 1, 1933, and June 1, 1934, was $19,608,493.92.

" 'The Shell Petroleum Corporation with the Shell Pipe Line Corporation have a number of officers and employees who perform services for both companies. In the general office force in St. Louis we have forty-four persons employed. I do not know that any of these forty-four are included in the Petroleum Company pay roll. The blue print department of Shell Petroleum Corporation performs services for our company. The employees of this department are not included in these forty-four. We have our pay roll in St. Louis. These forty-four employees who perform all their services for the Pipe Line Company receive their entire compensation from the Pipe Line Company. The employees of the Petroleum Company receive their compensation from the Petroleum Company. There is a charge made against the Pipe Line Company for the performance of these services by employees of the Petroleum Corporation. There has been an estimate made of the value of these services to the Pipe Line Company and it is handled in a lump sum each month.

" 'During the years 1934 and 1935 Shell Pipe Line Corporation transported for Shell Petroleum Corporation in the neighborhood of 50,000,000 barrels of petroleum. Shell Petroleum Corporation provided receptacles for receiving petroleum at the refineries. Payments are made to us for transportation of petroleum once a month. This is also set up on the books of the company. There is no actual payment in cash at that time. It is a bookkeeping transaction.

" 'We lease our office space in the Shell Building from the Shell Petroleum Corporation. This is a bookkeeping transaction also. The Pipe Line Company did not go through the formality of issuing actual warrants having drafts.

" 'The purchasing department of the Petroleum Company also acts for the Pipe Line Company. If we have occasion to buy material, we issue a purchase requisition and I initial it and send it to the purchasing department, and they purchase it in our name, and when the payment becomes due we issue a check in payment of the account. I think that is done out of the St. Louis bank account.

" 'The payment of dividends is not a book transaction, that is handled by check. Our directors declare dividends and the money is actually paid out by check. I do not hold any office in, or perform any service for, the petroleum company.

" 'Defendant does not provide groceries for its employees, but they permit the equipment to be used for the purpose of bringing such supplies to the station for the employees. . . .

" 'We have six pumping plants in Missouri. We obtain the fuel for operating these pumps from Shell Petroleum Corporation. We draw off sufficient fuel from the line to operate these stations for several weeks. . . .

" 'We have twenty acres of ground at most of these plants. Generally all that ground is necessary for the operation of these plants. . . . Forty acres is not required at the Richland station, but I think we had to take forty acres to get the ground required. The ground here is quite even and in order to get a suitable location we took the forty acres.

" 'The telegraph and telephone line is entirely owned by us. We own the poles and the right of way and the wires, except for the wires that belong to the Ajax Company. Ajax owns the wires they run along our poles and they own the insulators. They have these attached to our crossarms on our poles.

" 'There are forty-one houses we are furnishing to our employees for rental in this state; there is one house at each station known as the dormitory, to which no rents apply. The dormitory is for single men and transients. The value of these houses, if erected today, would be approximately $2500 each. We have lighting systems at these various pumping stations and these houses are furnished with lighting fixtures. No charge is made to the employees for that. The employees furnish their own arrangements for heating—usually a stove. The houses do not have telephone service, except the chief engineer. If they have telephone service they provide it themselves. We have a miniature water system at these stations. These houses are furnished with water. A charge is made for that. The houses have been built with a sewer connection with a septic tank. The employees provide their own transportation to school.

" 'The pipe line was originally a 10-inch line running from Oklahoma to Illinois, and it had five pumping stations, three in Missouri. We built loops and put in three additional pump stations in Missouri. This work was started in 1925. I do not know exactly when it was completed—1927, I believe—that is, up to this period. There has been some additional work done within the last year. The work that was done at that time more than doubled the capacity of the line. I do not recall exactly the cost of these additions to the line, but I would say several million dollars.

" 'As to the work that has recently been done, we have added one additional pumping unit at each of the stations and completed the loop, so we have two full lines, and at two stations we have added a short section of third line. This last improvement began this year (1937). The piping is done. The pumping equipment has not been delivered yet.

" 'We have, at various times, exercised the right of eminent domain in this state and we may want to do it again, tomorrow or maybe ten years.

" 'Shell Petroleum Corporation has refineries at East Chicago, Indiana; Wood River, Illinois; Arkansas City, Kansas; Houston, Texas, and these are the terminals of our pipe lines. . . .

" 'The payment for services rendered to the Pipe Line Corporation by employees of the Petroleum Corporation is a bookkeeping operation only temporarily. Ultimately the balance is cleared up by cash payment. We give Shell Petroleum credit for the amount of such services no the amount it owes us. The charges for carrying oil for Shell Petroleum is the same. They are carried during the accounting period until the treasurer decides what the balance due us is, and then it is paid.'

"The deposition of Paul R. Chenoweth was taken by the plaintiff. This witness testified as follows:

" 'I am assistant secretary and assistant treasurer of Shell Pipe Line Corporation. I hold the same offices in Shell Petroleum Corporation. Defendant maintains a bank account with the Mississippi Valley Trust Company at St. Louis. It maintains other bank accounts in New York City. We have pay roll accounts in half a dozen banks throughout our territory. . . . The receipts from the pipe line business, as they are received from our customers, pass through the St. Louis account. As a general rule, the funds which go to these other accounts are transfers of money from our St. Louis account to the locality from which thereafter checks are drawn for the petty cash matters.

" 'Our New York account is used for a different purpose. Bills are paid out of New York City where payments require New York exchange, and there are certain special receipts that are deposited in that account. The only items that I can think of at this time as special receipts are advances by the parent company, and interest payments that might be due Shell Pipe Line Corporation, that would be payable through the New York office. The interest would be the balance due the Pipe Line by the parent corporation. Shell Union Oil Corporation, which is the parent company, pays interest to Shell Pipe Line Corporation on money owed by Shell Union to the Pipe Line Company. These are not a fixed item every month, but they would run around $50,000 a month at times. Shell Petroleum makes payment on account to the Pipe Line Company, and the Pipe Line Company collects interest on the balance remaining unpaid in the transportation account. . . .

" 'Shell Petroleum pays so much on account for the transportation charges from time to time. When the time comes around to pay the dividends, the Petroleum Corporation will settle up enough of its account to permit the Pipe Line Corporation to pay its dividends that it has declared.

" 'The records of Shell Petroleum and the records of Shell Pipe Line are kept separately. The Pipe Line rents office space from Shell Petroleum, and pays Shell Petroleum for that space. Shell Pipe Line *is* always paid for all of the oil that it carries for Shell Petroleum, *is*

paid all of the transportation charges. Shell Pipe Line always pays Shell Petroleum for anything that the latter does for it.

" 'Shell Union Oil Corporation advances money to Shell Petroleum for the latter to pay Shell Pipe Line. The interest that I spoke of that is paid to Shell Pipe Line is on money still owing the Pipe Line for transportation charges.

" 'Sometimes Shell Petroleum pays the Pipe Line without borrowing if it has the money at hand. If the Petroleum Company has not sufficient money at hand it borrows the money from Shell Union, to pay on account of the transportation charges and other obligations of Shell Petroleum. Shell Petroleum has to look out for its own debts which it owes to Shell Union or anybody else.' "

The tax sought to be collected is levied under Sec. 4641, R. S. 1929, Mo. Stat. Ann., p. 2057, which provides, so far as pertinent here, that "Every corporation not organized under the laws of this state, and engaged in business in this state, shall pay an annual franchise tax to the State of Missouri equal to one-twentieth of one per cent of the par value of its capital stock and surplus employed in business in this state . . ." There is another section of our statutes (Sec. 4596, R. S. 1929, Mo. Stat. Ann., p. 2030), which provides in substance that every corporation for pecuniary profit formed in any other State must, before it can be permitted to transact or continue business in this State, have and maintain a public office or place in this State for the transaction of its business, where legal service may be obtained upon it, etc., and it shall be subject to all the liabilities, restrictions and duties which are or may be imposed upon corporations of like character organized under the general laws of this State, and shall have no other or greater powers, and shall not engage in any business other than that expressly authorized in its charter or the law of this State under which it may come and shall not hold real estate for longer than six years except such as may be necessary and proper for carrying on its legitimate business.

Respondent contends that Sec. 4956 must be read in conjunction with Sec. 4641, and that the two sections, read together, impose a privilege tax on all corporations *authorized* to transact business in the State regardless of whether intrastate business is transacted or not. We think this contention is answered, adversely to respondent, by the opinion of this court *en banc* in State v. Phillips Pipe Line Co., 339 Mo. 459, 97 S. W. (2d) 109. In that case the same two sections of our statute were considered. It was contended there, as here, that the two sections, read together, impose a privilege tax upon all corporations authorized to transact business in this State regardless of whether or not intrastate business is actually engaged in. As we read that case that contention was denied. We quote (339 Mo. l. c. 465, 97 S. W. (2d) l. c. 111, (1-2).

"Reverting to the Attorney General's contention that Sections

4596 and 4641, Revised Statutes 1929, impose a franchise tax upon the privilege of being a corporation and to conduct business as a corporation regardless of whether that privilege is exercised or the manner in which it may be exercised. That question is not decisive of this case. It is of slight consequence that the State may have the power to levy a franchise tax on a foreign corporation authorized to transact business in Missouri, but which may not be doing so, unless the State has exercised that power by appropriate legislation. [Pennoyer v. Neff, 95 U. S. 714.] Has it done so? Our conclusion is that it has not. It is true that, as the Attorney General argues, the statute (Sec. 4596, supra) provides that every corporation for pecuniary profit formed in another state shall establish and maintain an office here and be subject to all the liabilities, restrictions and duties which are or may be imposed upon corporations of like character organized under the laws of this State before such foreign corporations shall be authorized or permitted to transact business in this State, yet this act is of a general nature and is not dealing specifically with the levy of any tax. (2) Section 4641, supra, is a special act dealing particularly with this subject. The latter act provides:

" 'Every corporation not organized under the laws of this state, *and engaged in business in this state,* shall pay an annual franchise tax to the state.'

"This language is clear and unequivocal, deals specifically with the subject matter under consideration here, and must control. To hold otherwise would result, not only in permitting the general language of Section 4596, supra, to control the specific provision quoted, but would also result in the imposition of a tax without a clear and express statutory direction—a result not permitted. [State ex rel. Ford Motor Co. v. Gehner, 324 Mo. 24, 27 S. W. (2d) 1.]"

In the Phillips Pipe Line Company case the validity of the franchise tax was upheld, but because the court considered the activities there shown to be the transaction of intrastate business and not necessarily incident to and therefore not a part of interstate transportation. The court said, 339 Mo. l. c. 467, 97 S. W. (2d) l. c. 112—that the vital question was—"were the operations performed by respondent at its Jefferson City terminal necessarily incident to and therefore a part of the (interstate) transportation? If they were, then respondent's entire business is interstate . . ."

It seems to be conceded, as we think it must be, that the State cannot lay a tax on purely interestate commerce or upon the privilege of engaging therein. [State v. Phillips Pipe Line Co., supra; Ozark Pipe Line Corporation v. Monier, 266 U. S. 555; James v. Draco Contracting Co., 302 U. S. 134, 158; Cooney v. Mountain States Tel. Co., 294 U. S. 384; Montgomery Ward & Co. v. Becker, 334 Mo. 789, 69 S. W. (2d) 674.]

Respondent emphasizes the fact that the original license is-

1240

sued to appellant's predecessor authorized it "to engage in the State of Missouri exclusively in the business of transporting crude petroleum by pipe line" and that in 1928 it filed an "Affidavit of Extension of Business Purposes," quoted above. The additional rights (if any) asked by the affidavit for extension were, in substance, to obtain rights of way for its pipe lines and to erect, maintain and operate telephone and telegraph lines to be used in connection with and incident to the operation of its pipe lines. In this connection we call attention to what this court said in substance, in State ex rel. Cities Service Gas Co. v. Public Service Commission, 337 Mo. 809, 825, 85 S. W. (2d) 890, 898, that the important thing is not what the Pipe Line Company had the right to do under its charter or "Extension Affidavit" but what it did do—the privilege which it exercised. See also quotation supra from State v. Phillips Pipe Line Company. So, then, without discussing whether or not or to what extent, if any, the "Extension" affidavit enlarged the original charter powers of appellant, we think the immediate and controlling question before us is did appellant, under the conceded facts, engage in intrastate business in Missouri?

It is conceded that it has on several occasions exercised and may again exercise the right of eminent domain in order to obtain or facilitate the obtaining of rights of way for its interstate pipe lines. In State ex rel. Cities Gas Service Co. v. Public Service Comm., supra, the plaintiff Pipe Line Company was a foreign corporation licensed to do business in the State. The court held that it had the right to condemn land and lay pipe lines, if for public use, without thus becoming liable for the franchise tax, citing and quoting from Ozark Pipe Line Corporation v. Monier, supra, and said also that "because the Pipe Line condemned land and applied to the Commission (Pub. Serv. Comm.) for a certificate to lay the pipe lines did not estop it from denying that it was engaged in intrastate commence." [See Ozark Pipe Line Corporation case.]

Appellant maintains six pumping stations in Missouri, for the purpose of its interstate transportation, used only in such transportation and being necessary to accomplish such transportation. It is stipulated that "Its business is solely that of a common carrier of petroleum for others for hire." At these pumping stations it maintains certain storage tanks, pumping machinery, etc., reasonably appropriate, it seems to us, to insure the efficient and continuous interstate flow of petroleum through its pipe lines. It does not produce, buy or sell petroleum in Missouri, or own any except relatively small quantities purchased for fuel for use at its pumping stations. It receives no petroleum in Missouri for transportation and delivers none. It owns its rights of ways and the sites for its pumping stations, but these are necessary adjuncts of its interstate transportation business. Upon each of the pumping station sites it has erected and owns

"several" residence houses for use by its employees. "These houses are only for the purpose of having places to live for the employees so that they may not have to live inconvenient distances from the pumping stations, and so that they will be immediately available in case of accident or other emergency"—the pumping stations being located in "isolated localities, somewhat removed from a location where these employees could rent houses; emergencies might come up where we need to call extra help—where a man is hurt or sick or fails to show up when his shift comes around. So these houses are built so the men might be subject to call at any time."

Appellant owns a total of forty-one such houses at its various pumping stations in Missouri, and it charges the employees occupying them a rental, aggregating $216 per month, shown by the evidence to be only a nominal rental, cost of buildings considered, and charged for the purpose of equalizing proportionately the pay of those occupying the houses with that of other employees. At most of the stations appellant owns twenty acres of land, an amount reasonably necessary for its interstate operation. At one station it has forty acres, which its manager testified he thought was more than required but he understood appellant had to take the whole forty in order to get a suitable location and the land it actually required. Appellant does not provide groceries for its employees, but permits its trucks to be used (apparently without charge) in bringing supplies to the stations for the employees.

Respondent contends that the activities sketched above in regard to owning and renting houses, etc. (more fully detailed in our statement of facts), constituted the doing of intrastate business within the meaning of our statute. We do not think so. The houses were not built or maintained for the purpose of making a profit by renting them and, at the rental charged, they could not have returned a profit to appellant. Appellant's purpose in building and furnishing them to its employees was to facilitate its business of interstate transportation and to make more certain and efficient the operation of that business. As said in State v. Phillips Pipe Line Co., supra, if such operations were "necessarily incident to and therefore a part of the (interstate) transportation" then the Pipe Line's entire business is interstate, so far as concerns this feature of the case. We think "necessarily incident," as thus used, means reasonably and fairly incident as a necessary requirement for the complete and efficient use of the pipe line in interstate transportation. On the facts before us we think the furnishing of such houses should be regarded as purely incidental to appellant's business of interstate transportation.

It is contended also by respondent that in laying an additional pipe line appellant more than doubled its facilities for "the transaction of its business of transporting petroleum products by pipe line," which necessitated the digging of additional ditches, laying of

1242

additional pipe, installation of additonal pumps, etc. Respondent argues that ''This activity is essentially to be distinguished from interstate commerce.'' But is it? Respondent cites on this point Browning v. Waycross, 233 U. S. 16, 34 Sup. Ct. 578, 58 L. Ed. 828; General Railway Signal Co. v. Commonwealth of Virginia, 246 U. S. 500, 38 Sup. Ct. 360, 62 L. Ed. 854; and other cases, including National Refrigerator Co. v. Southwest Mo. Light Co., 288 Mo. 290, 231 S. W. 930. We have read the cases cited but think they are distinguishable on the facts and we do not consider them as sustaining respondent's contention on this point. If the building of appellant's first pipe line was for interstate transportation of petroleum products how could the building of a second for the same purpose or extension of that business constitute or involve intrastate business if the first did not? The difference would be only one of degree, not of principle, a difference in the *amount* of interstate commerce appellant could do but not in the character of the business. And if a foreign corporation is authorized under Federal law to do in or through Missouri interstate commerce surely it must have the right—a necessarily incident right—to do the things essential to effectuate its right to carry on the interstate commerce, such as constructing the facilities necessary for carrying on the interstate commerce. To hold otherwise would be to say that the right, under Federal law, to engage in interstate commerce without let or hindrance from the State is but an empty shell—a thing without substantial value.

It is contended that in withdrawing from storage tanks a (relatively small) quantity of oil for use as fuel, to be used—and which was used—in operating its pumps, appellant engaged in intrastate business. It *bought* that oil from Shell Petroleum Corporation. It had to have oil in order to operate its pumps and carry on its interstate transportation, and of course had to procure it from some source. It was not transporting its own oil. The *buying* of oil for fuel for the sole purpose of carrying on its interstate transportation was necessarily incident to that business. Appellant might reasonably buy at one time and keep on hand enough to last ''for several weeks'' as it did do, (and that is all it did), in this connection. If it had bought a similar amount of fuel oil, for like purpose, from some wholly outside concern, could it be said it was thus engaging in intrastate business? We think not. Respondent cites, on this point, Nashville, Chattanooga & St. L. Railroad Co. v. Wallace, 288 U. S. 249, 53 Sup. Ct. 345, 77 L. Ed. 730. In that case the tax in question was laid upon the *storage* or *withdrawal* from storage, of gasoline, ''for sale or other use.'' Not so in the case at bar. In this case the tax is laid upon foreign corporations, ''engaged in business in this state'' in proportion to their capital and surplus ''employed in business in this state.'' This we think must mean engaged in intrastate business and capital and surplus employed in intrastate

business in this State, because the State cannot tax *interstate* commerce. In the Nashville, etc., case, supra, the tax was laid, as we have stated, upon the storage or withdrawal of gasoline "for sale or other use." It was held that the interstate shipment originally begun ceased when the gasoline reached the storage tanks and that the continued use of the gasoline in connection with interstate commerce, if it should be made, had not begun when the storage tax accrued. The court said, 288 U. S. l. c. 266:

"Neither the appellant, the shippers, nor the carrier, at the time of the shipment of the. gasoline from points of origin, arranged a destination for any part of the oil other than the appellant's storage tanks in Tennessee. Although in the usual course of business a variable and undefined part of it, when segregated for that purpose, would again be transported across state boundaries, appellant was free to distribute the oil either within or without the state for use in its business or for any other purpose."

In the case before us the oil in question was not shipped or consigned to appellant. It belonged to Shell Petroleum Corporation and was purchased by appellant from that corporation, for use— and was used—only in the necessary carrying on of its interstate business. It seems to us that if anyone, in that transaction, did intrastate business it was the Shell Petroleum Corporation, owner of the oil, in selling it to appellant, rather than, under the circumstances, the appellant, in buying it— and we may observe that Shell Petroleum pays a franchise tax for doing intrastate business in Missouri.

Respondent asserts that the operations of appellant are so closely associated with the Shell Petroleum Corporation and so intermeshed and involved that the act of one constitute the acts of all. In May Department Stores Co. v. Union Electric L. & P. Co., 341 Mo. 299, 327, 107 S. W. (2d) 41, 55 (11), we read:

"Equity sets aside legally sufficient conveyances if their purpose is to defraud creditors. If any intercorporate affiliation is devised for or is being used to accomplish an improper or unlawful purpose, certainly equity does have the authority to tear down technical legal barriers and reach beyond them to impose liability or grant proper relief. If the purpose is lawful, and fair and equitable to those with whom it is intended to deal, legal forms and relationships should be observed. Men have the right to use legal forms which they believe to be helpful in accomplishing proper purposes."

The facts of that case are so different from those of the instant case as to make it not in point on the facts but the general principle of law announced we agree is sound. But as more particularly applicable to the instant case see the following:—Martin v. Development Co. of America (C. C. A.), 240 Fed. 42, holding that a holding corporation owning all or practically all of the stock of another corporation is to be treated as a separate entity "unless facts are averred (or

shown) which show that such separate corporate existence is a mere sham, or has been used as an instrument for concealing the truth, or where the organization and control are shown to be such as that it is but an instrumentality or adjunct of another corporation;'' Pittsburgh & Buffalo Co. v. Duncan (C. C. A.), 232 Fed. 584, 587, holding, ''True, the legal fiction of distinct corporate existence will be disregarded when necessary to prevent fraud, or when a corporation is so organized and controlled and its affairs so conducted 'as to make it only an adjunct or instrumentality of another corporation.' [Citing cases.] But 'it requires a strong case to induce a court of equity to consider two corporations as one, on account of one owning all the stock of the other.' [1 Cook on Corporations (7 Ed.), sec. 317, and see Peterson v. C., R. I. & P. Ry. Co., 205 U. S. at page 393, 27 Sup. Ct. 513, 51 L. Ed. 841.]'' Consult also Meischke-Smith v. Wardell (C. C. A.), 286 Fed. 785, in which a number of authorities are reviewed. We quote part of paragraph 1 of the syllabus, which reflects the holding of the court:

''Where all of the stock of a pipe line corporation was owned by the corporation for whom the oil was transported, the officers of the two companies were the same to a large extent, and the accounts of the pipe line company were kept in the office of the holding corporation, though its field force was separate, and it had a separate bank account, the two corporations were distinct, . . .''

In Ozark Pipe Line Corporation v. Monier, supra, the plaintiff, seeking to restrain collection of the Missouri franchise tax was the same corporation, (before it changed its official name) as defendant, appellant, in this case. Its organization and method of carrying on its business was then, so far as we can gather from the facts stated in the opinion and from the evidence in the instant case, substantially similar to those since employed. In the Ozark Pipe Line case the court did not discuss the question of disregarding corporate entity, but it did hold that the business actually carried on by the pipe line company was exclusively in interstate commerce; that ''the maintenance of an office, the purchase of supplies, employment of labor, maintenance and operation of telephone and telegraph lines and automobiles and . . . other acts within the state, were all exclusively in furtherance of its interstate business; and the property itself, however extensive or of whatever character, was likewise devoted to that end. They were the means and instrumentalities by which that business was done and in no proper sense constituted, or contributed to, the doing of a local business. The protection against imposition of burdens upon interstate commerce is practical and substantial and extends to whatever is necessary to complete enjoyment of the right protected.'' The Pipe Line Corporation was held not subject to the tax.

We have stated the facts at length and shall not further repeat

them. Our conclusion on this point is that appellant is to be regarded as a separate and distinct entity from Shell Petroleum Corporation.

Respondent contends that the renting of pole space or privilege on its telephone poles to Ajax Pipe Line Company was the doing of intrastate business so as to make appellant subject to the franchise tax assessed. We cannot agree to this contention. Appellant's original license in Missouri was to engage exclusively in the business of transporting crude petroleum by pipe line. Pursuant to its "extension affidavit," it was authorized to errect, maintain and operate telegraph and telephone lines to be used in connection with the maintenance and operation of such pipe lines and for purposes incident thereto. And, if we may judge from the conceded facts, the purpose for which appellant was created and its usual and ordinary business was the transportation of petroleum products by pipe line. It was not a telephone or telegraph company and was not organized for the purpose of conducting that kind of business. Its telephone line in Missouri was not built or maintained for the purpose of furnishing telephone or telegraph service to others but only for its own use in conducting its interstate transportation business. It had some extra pole space which, for the time being, it did not need, and it rented that space to the Ajax Company. Mr. Smith testified, "We do not make a new contract with the Ajax each year. The contract was made for a primary term of five years, automatically renewing itself for one year periods unless cancelled by either party on the the fifth anniversary or any subsequent anniversary." In 12 R. C. L., sec. 48, p. 69, we read:

"It seems to be the consensus of opinion that a corporation, to come within the purview of most statutes prescribing conditions on the right of foreign corporations to do business within the state, must transact therein some substantial part of its ordinary business, which must be continuous in the sense that it is distinguished from merely casual or occasional transactions."

"To constitute a doing of business, however, the act must be such a one as appertains to the ordinary business and purposes of the corporation, as distinguished from an act within its powers."

And further, Sec. 49, p. 71.

"It is frequently stated that the words 'doing business,' and 'transacting business,' as used in statutes imposing conditions on foreign corporations, refer only to the transaction of the ordinary or customary business in which a corporation is engaged, and do not include acts not constituting any part of its ordinary business. In other words, the test applied is, Is the corporation engaged in the transaction of that kind of business, or any part thereof, for which it was created and organized? If so, it 'does business,' within the meaning of the constitutions and statutes. If not—if the act it is doing or has done is not within the purpose of the grant of its general powers and

franchises—it is not the business to which the constitutional or statutory requirement is directed." [See also C. J., 14A, p. 1276, sec. 3982.]

In Missouri Coal & Mining Co. v. Ladd, 160 Mo. 435, 61 S. W. 191, a foreign corporation had been organized for the purpose of mining and selling coal and manufacturing and selling coke. For some years prior to 1895 it had mined and sold coal from lands it owned in Missouri, but after 1895 it had not done so, nor manufactured or sold coke. In 1891 our Legislature passed an act providing that a foreign corporation, before it could transact business in this State, or *continue* business if already established, should maintain an office or place where service could be had upon it, file copy of its charter with the Secretary of State, etc., and failing so to do, it could not maintain an action in this State. [Laws 1891, p. 75. For similar provisions in our present statutes see Sections 4596, supra, and Section 4599, R. S. 1929, Mo. Stat. Ann., p. 2040.] The Coal and Mining Company, after it ceased mining and selling coal and manufacturing coke, rented its lands to tenants for agricultural purposes. The court held that in so doing it was not "doing business as a corporation" within the meaning of the statute, "nor is it (such leasing) any part of the purpose for which it was incorporated. Non-resident business corporations can and do pay taxes upon, and lease their lands in this state, and when incorporated for other purposes it has never been considered that in so doing they were transacting or continuing any business in this state other than that for which they were incorporated." [160 Mo. l. c. 442, 61 S. W. l. c. 192.]

In Shields v. Chapman (Mo. App.), 240 S. W. 505, the suit was on a note given by a foreign corporation not licensed in Missouri, and the plaintiff sued the defendant Chapman on the theory that since the corporation was not licensed to do business in Missouri it possessed no corporate capacity in this State and therefore persons assuming to transact business in this State in its corporate name were liable as partners. (Chapman was president of the corporation and as such had executed the note for and in the name of the corporation. J. Marvin Smith had attested it as secretary. Chapman, Smith and R. R. Hanger, a stockholder, were named as defendants originally but the action was dismissed as to Smith and Hanger.) The court denied the plaintiff's contention, saying (240 S. W. l. c. 506):

"Under these statutes it has been held that a contract entered into, in this state by a foreign corporation that has not been licensed to do business in this state is void. [Tri-State Amusement Co. v. Amusement Co., 192 Mo. 404, 90 S. W. 1020, 4 L. R. A. (N. S.) 688, 111 Am. St. Rep. 511, 4 Ann. Cas. 808.] However, not every contract made by such a corporation is void, but only such contracts, that are entered into while such corporation is doing or transacting business

for which the corporation was incorporated, and not merely while transacting such business as it might have authority to do.

" 'There must be a doing of some of the works, or an exercise of some of the functions, for which the corporation was created to bring the case within the clause.' "

The court also cited Hurst Automatic Switch & Signal Co. v. Trust Co. of St. Louis (Mo.), 216 S. W. 954, and Wulfing v. Armstrong Cork Co., 250 Mo. 723, 157 S. W. 615, quoting excerpts which seem to sustain the Appellate Court's statement.

In the Shields case the court also points out that according to the weight of authority isolated transactions, commercial or otherwise, between a foreign corporation domiciled in one State and citizens of another State are not a doing or carrying on of business by the foreign corporation within the latter State, and this we believe to be the generally accepted doctrine where the act in question was not part of the business for which the corporation was organized. [Consult 14A. C. J., sec. 3979, p. 1273; 12 R. C. L.—supra.] The renting of this pole space to the Ajax Company was the only transaction of that kind done by appellant in Missouri. Under the facts and circumstances shown we do not think it constituted being "engaged in business" in this State within the intendment of the statute.

 Respondent further contends that appellant is estopped to deny that it was doing intrastate business because, in 1932 and again in 1935, it filed with the Secretary of State certain anti-trust affidavits, made by its agent, which were offered and, over the objections of appellant, were admitted as admissions that it had done intrastate business. We shall not lengthen this opinion by quoting the affidavits in full. Illustrative we quote a portion of the affidavit made July 24, 1935: "I, Carl Barker, do solemnly swear that I am the principal agent of the corporation known and styled Shell Pipe Line Corporation . . . and now transacting or conducting business in the State of Missouri." The affidavit purported to be made in compliance with Sections 4614 (Corporations) and 8728 (Pools, conspiracies, etc.), R. S. 1929. [Mo. Stat. Ann., pp. 2047 and 6503, respectively.] It seems to be contended that the statement "now transacting or conducting business in the State of Missouri" and the fact that appellant filed such affidavits estop it from now denying that it was doing *intrastate* business. We think not.

Estoppel does not *create* a cause of action, if none otherwise existed. "It was never intended to work a positive gain to a party. Its whole office is to protect him from a loss which, but for the estoppel, he could not escape." [State ex rel. Moss v. Hamilton, 303 Mo. 302, 260 S. W. 466, 470.] It seems to us that the affidavits, if they amounted to any admission, stated only conclusions of law, or at most a statement of mixed law and fact. In Wright v. Quattrochi, 330 Mo. 173, 181-182, 49 S. W. (2d) 3, 6 (2-3), we held that state-

1248

ments which were mere conclusions of law were not admissible as substantial evidence of facts. In the instant case all the facts are shown. In our opinion the facts do not authorize the assessment and collection of the tax, and we are of the opinion that appellant is not estopped from so claiming.

The judgment of the circuit court is reversed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.